**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br><br>**STEVE M. BAJIC,**<br>**RAJESH TANEJA,**<br>**NORFOLK HEIGHTS LTD.,**<br>**FOUNTAIN DRIVE LTD.,**<br>**ISLAND FORTUNE GLOBAL LTD.,**<br>**CRYSTALMOUNT LTD.,**<br>**WISDOM CHAIN LTD.,**<br>**SSID LTD.,**<br>**SURE MIGHTY LTD.,**<br>**TAMARIND INVESTMENTS INC.,**<br>**KENNETH CIAPALA,**<br>**ANTHONY KILLARNEY,**<br>**BLACKLIGHT SA,**<br>**CHRISTOPHER LEE MCKNIGHT, and**<br>**AARON DALE WISE,**<br><br>**Defendants.** | **Civil Action No. 20-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Steve M. Bajic, Rajesh Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Kenneth Ciapala, Anthony Killarney, Blacklight SA, Christopher Lee McKnight, and Aaron Dale Wise (collectively, the "Defendants"):

**SUMMARY**

1. This is a securities fraud enforcement action. From at least July 2015 through at least June 2019 (the "Relevant Period"), Steve Bajic and Rajesh Taneja schemed with Kenneth

Ciapala and Anthony Killarney and others to enable public company control persons fraudulently to sell stock to retail investors in the public United States securities markets.

2.      Bajic and Taneja controlled a network of foreign companies that includes defendants Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., and Tamarind Investments Inc.  Bajic and Taneja operated these corporate defendants as a single enterprise and treated their assets as fungible.  Ciapala and Killarney together controlled Blacklight SA, a foreign entity that purported to be an asset manager, and also controlled a network of foreign nominee companies they referred to as "clients."  The Bajic-Taneja network of companies and Blacklight SA and its network of "clients," were two trading platforms – both of whose primary business purpose was to facilitate illegal securities transactions in United States securities markets to the detriment of both the market itself and unsuspecting retail investors.  All of these defendants (Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA) will be referred to in this Complaint as the "Platform Defendants."

3.      Bajic, Taneja, Ciapala and Killarney used various offshore nominee companies to provide a layer of disguise to public company insiders or control persons, who intended to defraud investors by secretly dumping large quantities of stock—including the securities of a New York-based public company, Blake Insomnia Therapeutics, Inc. ("Blake")—in circumvention of registration and disclosure requirements imposed by the federal securities laws.

4.      Since July 2015, the Platform Defendants have illegally assisted numerous companies' control persons by orchestrating the coordinated dumping of shares to unsuspecting investors in the public markets.  The Platform Defendants' coordinated dumping involved selling

the securities of at least 45 public companies, for net trading proceeds of about $35 million.  In addition, without coordinating with Bajic, Taneja and the entities they control, Blacklight SA has engaged in the same type of illegal dumping of the shares of dozens of other companies, for net trading proceeds of at least another $25 million.  Without coordinating with Blacklight SA, Bajic and Taneja and the entities they control have also engaged in the same type of illegal dumping of the stock of dozens of other companies, for net trading proceeds of at least $7.7 million.  The Platform Defendants, together and separately, were paid a percentage of the net trading proceeds as compensation for arranging these illegal stock dumps.

5.    Before selling stock, control persons are required to: (a) register the stock with the Commission pursuant to Section 5 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. § 240.144], including limitations on the amount of stock a control person can legally sell.  Also, investors in certain public companies are required publicly to disclose any ownership interest in excess of 5% of the company's publicly traded stock.  Such registration requirements, sale restrictions, and disclosure obligations are critical safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and from whom they would be buying that stock.

6.    The Platform Defendants, working in concert with control persons, sought to evade these registration and disclosure rules by concealing the identities of control persons (typically by holding the stock in offshore corporate accounts that served as nominee stockholders) from the public, brokers, and regulators.  The Platform Defendants' sales of the stock of publicly traded companies were treated by the market as if they were sales by ordinary

investors, when, in actuality, the Platform Defendants were dumping stock into the securities

markets on behalf of corporate insiders in violation of the laws governing such sales.

7.      The Platform Defendants also manipulated the stock price and volume of Blake

and other companies to create the false appearance of active trading for the purpose of inducing

investors to buy and sell stock.  The Platform Defendants coordinated their trading activity with

the intent to manipulate the actual supply and demand of the stock (like Blake's) they intended to

sell.

8.      Bajic, acting in concert with Taneja, also directly or indirectly paid stock

promoters to tout the stock of companies that the Platform Defendants intended to sell.  These

payments were made through a series of intermediary entities to disguise the identity of the

persons who were really paying for the stock promotions.  To achieve this layer of disguise,

Bajic and/or Taneja utilized the services of Christopher Lee McKnight ("McKnight") and Aaron

Dale Wise ("Wise"), who assisted them in concealing the source of the money used to pay for

the promotions.  Bajic and/or Taneja sent at least $4 million, directly or indirectly, to McKnight,

who then sent most of that money to Wise, who then sent most of the money he received to the

stock promotion firm.  Both McKnight and Wise used business bank accounts they controlled to

disguise the source of the money paid for those stock promotional services.

9.      At or about the same time that Bajic and/or Taneja secretly paid stock promoters

to encourage investors to buy stock in public companies, the Platform Defendants sold those

stocks to investors.

10.      Bajic, Taneja, Ciapala and Killarney collectively earned fees and commissions

ranging from 4-10% based on the stock they sold on behalf of control groups and shared these

fees and commissions.  None of the Platform Defendants are registered with the Commission or any other jurisdiction as broker-dealers or investment advisers.

11.     As a result of the conduct alleged herein, the Platform Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), and Sections 10(b), 13(d), and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder; as well as aided and abetted violations by various control groups of  Sections 5(a), 5(c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  Also, McKnight violated, and unless restrained and enjoined will continue to violate, Section 17(a)(3) of the Securities Act, and aided and abetted violations by the Platform Defendants and various control groups of Sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.   Wise aided and abetted violations by the Platform Defendants and various control groups of, and unless restrained and enjoined will continue to aid and abet such violations of, Sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

12.     The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], orders barring the Platform Defendants from participating in any offering of a penny

stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

14.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, during the Relevant Period, certain individuals who reside in the Southern District of New York purchased the stock of Blake.

## DEFENDANTS

15.     Steve M. Bajic ("Bajic"), age 49, is a dual citizen of Canada and Croatia and a resident of Canada.

16.     Rajesh Taneja ("Taneja"), age 43, is a Canadian citizen, and resident of Vietnam.

17.     Norfolk Heights Ltd. is a Seychelles corporation owned by a dual Mexican and Canadian citizen referred to herein as Person A.  Person A is a nominee whose activities on behalf of Norfolk Heights Ltd. were directed by Bajic and Taneja.

18.     Fountain Drive Ltd. is a Seychelles corporation with a registered address in Hong Kong and is owned by Taneja.   SSID Ltd. is a Hong Kong corporation with a registered address in Hong Kong and is owned by Taneja.

19. Island Fortune Global Ltd., Crystalmount Ltd., and Wisdom Chain Ltd. are Seychelles corporations with registered addresses in Hong Kong and, during most of the Relevant Period, were owned by Bajic.

20. Sure Mighty Ltd. is a Seychelles corporation owned by a Japanese citizen referred to herein as Person B. Person B is a nominee whose activities on behalf of Sure Mighty Ltd. were directed by Bajic and Taneja.

21. Tamarind Investments Inc. is an Anguilla corporation with registered addresses in Hong Kong and Thailand and is owned by Taneja.

22. Kenneth Ciapala ("Ciapala"), age 38, is a citizen of Switzerland and the United Kingdom, resides in Switzerland, and is the co-founder and co-operator of Blacklight SA.

23. Anthony Killarney ("Killarney"), age 34, is a citizen of the United Kingdom, a resident of Switzerland, and is the co-founder and co-operator of Blacklight SA.

24. Blacklight SA ("Blacklight"), is a Swiss corporation based in Geneva, Switzerland that was founded by Ciapala, Killarney and Roger Knox in 2010. Ciapala and Killarney are the only current owners of Blacklight SA, which holds itself out as an asset manager.

25. Christopher Lee McKnight ("McKnight"), age 45, is a Canadian citizen living in Canada.

26. Aaron Dale Wise ("Wise"), age 34, is a United States citizen and a Florida resident.

**BACKGROUND**

27. "Restricted stock" is stock of a publicly traded company (also known as an "issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not

registered with the Commission.  In addition, stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also includes disclosure of any person or group who is the beneficial owner of more than 5% of the company's securities.

28.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e., a control person).  "Control" means the power to direct management and policies of the company in question.  Typically, affiliates include officers, directors and controlling shareholders but any person who is under "common control" with or has common control of an issuer is also an affiliate.

29.     "Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  For example, if a control person buys shares in the company s/he controls, those shares are subject to restrictions and ordinarily require a registration for bulk sales of such shares.

30.     A "transfer agent" is a company which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have

publicly traded securities use transfer agents to keep track of the individuals and entities that own their stock.

31. An "underwriter" is any person or entity, such as the Platform Defendants, who either has purchased from an issuer with a view to distributing a security, or who offers or sells for an issuer (including an affiliate of an issuer) in connection with the distribution of any security.

**THE PLATFORM DEFENDANTS' BUSINESS PRACTICES**

32. During the Relevant Period, the Platform Defendants engaged in fraudulent coordinated activity to sell unregistered shares of multiple companies. The Platform Defendants provided a layer of disguise through which control persons (*i.e.*, public company affiliates) could conceal their identities while selling large amounts of stock to investors in the open market.

33. The stock held by these control persons was required to be registered or otherwise restricted from resale. It could not legally be sold in the manner, and in the quantities, that the Platform Defendants sold it. The Platform Defendants concealed the identities of control persons and knowingly or recklessly schemed to evade the Commission's registration and disclosure requirements.

34. In addition, in order to entice investors to purchase control persons' stock:

i. The Platform Defendants sometimes engaged in coordinated trades designed to manipulate the price and volume of trading in various publicly traded stocks in order to induce others to buy and sell those stocks; and

ii. Bajic, working in concert with Taneja, often paid for publicity aimed at boosting the market for the various stocks the Platform Defendants were selling, while concealing the involvement of the control groups he and the other Platform

Defendants served. To accomplish this, on numerous occasions, Bajic and/or Taneja sent money to McKnight and Wise as intermediaries. In this way, the public company control groups were able to conceal the fact that they were paying promoters to tout the securities that the Platform Defendants intended to sell on those control groups' behalf.

**EXAMPLE: BLAKE**

**Control Group A Takes Control of Blake and Transfers Stock to the Platform Defendants**

35. In or about August 2012, Blake issued approximately 10.6 million shares of its securities. In a private offering of securities, Blake sold approximately 1 million shares (in total) to 35 purportedly unaffiliated investors. At or about that time, Blake also issued approximately 9.6 million shares (in total) to four shareholders (the "Original Blake Affiliates") for services purportedly rendered to the company.

36. On or about December 16, 2013, an entity controlled by Blacklight SA directly or indirectly paid approximately $275,080 to Blake for purposes of acquiring almost all of the 10.6 million outstanding shares of the company's stock.

37. Shortly thereafter, one or more individuals acting in concert (referred to herein as "Control Group A") acquired, directly or indirectly, virtually all of Blake's stock. But, to disguise its control over Blake, Control Group A orchestrated the transfer of its Blake stock as follows:

i. All 35 shareholders who had purchased Blake shares in 2012 transferred their stock (totaling about 1 million shares), at Control Group A's direction, to an offshore nominee entity controlled, directly or indirectly, by Blacklight SA. These shares did not have a restrictive legend on them (*i.e.*, identifying the shares

as restricted from resale) because the 35 original shareholders had previously

registered their shares for sale as part of a registration statement filed with the

Commission in September 2012.

    ii.   The Original Blake Affiliates, at Control Group A's direction, transferred all of

the remaining shares (approximately 9.6 million) to seven offshore nominee

companies.  Some of these nominees were controlled directly by Blacklight SA

while others were controlled, directly or indirectly, by Control Group A.  These

shares had a restrictive legend on them.

38.    At or about the time that Control Group A acquired Blake's stock, in January

2014, Blake issued 21 million new shares of restricted stock to Blake's new Chief Executive

Officer and a Blake consultant, increasing the total shares outstanding to approximately 31.6

million shares.  Control Group A caused Blake to issue these shares of restricted stock in order to

dilute the percentage of shares held by the seven offshore nominee companies.  Indeed, after

Blake issued these 21 million shares, the seven offshore nominee entities each held between

4.3% and 4.4% of Control Group A's Blake stock.  The eighth nominee entity (the Blacklight SA

entity to which the 35 allegedly unaffiliated Blake investors had transferred their shares) then

held approximately 3.2% of Control Group A's Blake stock.  As a result, on paper, each of the

offshore nominee companies owned fewer than 5% of Blake's shares and thus appeared not to

trigger the disclosure requirements imposed on shareholders owning greater than a 5% interest in

the company.  In reality, because the offshore nominee entities were under common control, they

collectively controlled more than 5% of Blake's shares and should have disclosed that interest.

39.    On or about December 5, 2014, an attorney working for Blake falsely claimed in a

letter to Blake's transfer agent that none of the seven offshore nominee entities, which held the

9.6 million restricted shares of Blake stock, were affiliates of Blake.  The attorney's letter induced Blake's transfer agent to remove the restrictive legend from the stock held by the seven offshore nominee entities.

40.     In actuality, all of the stock owned by Control Group A was legally restricted from resale because Control Group A was an affiliate of Blake by virtue of, among other things, its control over the company's stock.  Accordingly, Control Group A was required to register that stock, or otherwise comply with the sale conditions of SEC Rule 144, before that stock could be sold into the public securities markets.

41.     Because Blake's stock was registered pursuant to Section 12(g) of the Exchange Act, Control Group A was also required to disclose in public filings with the Commission that it was the collective beneficial owner of more than 5% of Blake's stock.  It intentionally failed to do so.

42.     Instead, Control Group A coordinated with the Platform Defendants to disguise Control Group A's status as an affiliate of Blake in order to sell its stock illegally without either (a) an effective registration statement; or (b) complying with SEC Rule 144.

43.     For example, on or about July 9, 2015, Control Group A transferred, directly or indirectly, 1,390,000 shares of Blake stock to defendant Fountain Drive Ltd.  This transfer comprised approximately 4.4% of Blake's then-issued and outstanding stock.

44.     Taneja owned Fountain Drive Ltd.  When Taneja opened a bank account on Fountain Drive Ltd.'s behalf, he falsely claimed that he was using Fountain Drive Ltd. as a personal investment vehicle.  In actuality, he used Fountain Drive Ltd. to hold and sell stock, including Control Group A's Blake stock, on behalf of others in exchange for commissions and fees.

45.     The next day, on July 10, 2015, Control Group A transferred 1,370,000 additional Blake shares to defendant Island Fortune Global Ltd.  This transfer comprised approximately 4.4% of Blake's then-issued and outstanding stock.

46.     Bajic owned Island Fortune Global Ltd.  Island Fortune Global Ltd. identified Bajic as its principal in corporate documents.  Bajic signed documentation on Island Fortune Global Ltd.'s behalf pursuant to which Bajic directed the transfer of its Blake stock to a brokerage firm.  When Bajic opened a bank account on Island Fortune Global Ltd.'s behalf, he falsely claimed that he was using Island Fortune Global Ltd. as a personal investment vehicle.  In actuality, he used Island Fortune Global Ltd. to hold and sell stock, including Control Group A's Blake stock, on behalf of others in exchange for commissions and fees.

47.     By 2017, Control Group A had transferred all of the stock it initially acquired from Blake (*i.e.*, approximately 10.6 million shares) to entities controlled by the Platform Defendants.

48.     As the table below summarizes, through a series of additional transfers in or about 2016 and 2017, the Platform Defendants collectively took possession of 99.99% of Blake's purportedly unrestricted stock on Control Group A's behalf:

| Shareholder | Date Acquired | Platform | Shares Owned | % of Purported Unrestricted Shares |
|---|---|---|---|---|
| Fountain Drive Ltd. | 7/9/2015 | Bajic-Taneja Platform | 1,390,000 | 13.12% |
| Island Fortune Global Ltd. | 7/10/2015 | Bajic-Taneja Platform | 1,370,000 | 12.93% |
| Norfolk Heights Ltd. | 7/21/2016 | Bajic-Taneja Platform | 997,500 | 9.41% |
| Offshore Nominee A | 12/13/2016 | Blacklight SA | 1,380,000 | 13.02% |
| Offshore Nominee B | 12/13/2016 | Blacklight SA | 1,390,072 | 13.12% |
| Crystalmount Ltd. | 12/21/2016 | Bajic-Taneja Platform | 1,380,000 | 13.02% |
| Offshore Nominee C | 2/6/2017 | Blacklight SA | 1,300,000 | 12.27% |
| Tamarind Investments, Inc. | 7/3/2017 | Bajic-Taneja Platform | 1,389,000 | 13.11% |
| **TOTAL** | | | **10,596,572** | **99.99%** |

49.     As with Fountain Drive Ltd. and Island Fortune Global Ltd., Bajic and Taneja collectively controlled Norfolk Heights Ltd. and Crystalmount Ltd.  Crystalmount Ltd. identified Bajic as its principal in corporate documents.  And, Bajic signed documentation on Crystalmount Ltd.'s behalf pursuant to which Bajic directed the transfer of its Blake stock to a brokerage firm.

50.     Norfolk Heights Ltd. identified Person A as its principal in corporate documents; but, in actuality, Person A was merely a nominee working on behalf of Bajic in an administrative capacity.  Bajic, through Person A, controlled Norfolk Heights Ltd.'s bank and brokerage activities.

51.     Taneja owned Tamarind Investments, Inc.  Taneja identified himself as its sole shareholder on Tamarind Investments, Inc.'s brokerage account opening forms.

52.     Blacklight SA controlled Offshore Nominees A, B and C.  Blacklight SA opened brokerage accounts on behalf of each of these offshore entities.  Ciapala and Killarney, on behalf of Blacklight SA, had complete authority over the brokerage accounts held in the names of Offshore Nominees A, B, and C.

53.     The Platform Defendants knew, or were reckless in not knowing, that the offshore nominee shareholders were a sham designed to disguise the fact that, in actuality, the Platform Defendants held (and illegally coordinated sales of) the Blake stock of Control Group A.  For example:

      i.  The offshore nominee entities controlled by the Platform Defendants received the majority of Blake's purportedly unrestricted stock at or about the same time because the stock was collectively controlled by Control Group A.

      ii.  The Platform Defendants, directly or indirectly, coordinated the sale of virtually all of Blake's purportedly unrestricted stock without receiving any direction from

the supposed shareholders, such as Tamarind Investments Inc., because the stock was, in fact, controlled by Control Group A.

iii.   Bajic maintained electronic accounting ledgers in which he tracked the stock sold by the accounts in the names of the various nominee entities that he and Taneja controlled.  In those ledgers, Bajic debited and credited balances between the nominees' accounts as if they were fungible.  For example, Bajic would use one nominee's ledger (Norfolk Heights) to account for payments he made to promote Blake's stock but would transfer money into that nominee's ledger from the ledger of other nominees selling Blake's stock (like Fountain Drive) when the balance in the paying nominee's ledger reached zero.

iv.   Bajic tracked his and Taneja's sales of Blake stock on one ledger regardless of whether the on-paper owner of the selling offshore nominee account was Bajic, Taneja, or Person A.

v.   Bajic tracked commissions attributable to the sales of Blake stock by the nominees that he and Taneja controlled on an electronic ledger and shared half of those commissions with Ciapala and Killarney.

vi.   Bajic and Taneja communicated about the various offshore nominee accounts as if they were under common control, including one communication between the two in which Bajic referred to defendant Fountain Drive Ltd. as "our baby since day 1."  In another communication, Bajic asked Taneja what the "password" was to access the Norfolk Heights Ltd. email account, which was supposedly operated by Person A.  Bajic also directed all mail for Island Fortune Global Ltd., Crystalmount Ltd., Norfolk Heights Ltd., SSID Ltd. and Fountain Drive

Ltd. to his personal address despite the fact that Bajic was not listed anywhere as an owner of Norfolk Heights Ltd., SSID Ltd. or Fountain Drive Ltd.

54. The Platform Defendants knew, or were reckless in not knowing, that they were obligated to disclose their stock ownership by virtue of having the power to dispose, or direct the disposition, of over 5% of Blake's stock. This disclosure requirement applies to stock, like Blake's, that was registered pursuant to Section 12(g) of the Exchange Act. Indeed, the Platform Defendants knowingly schemed with Control Group A to create the false appearance that separate offshore companies controlled just under 5% of Blake's stock, when – in reality – the Platform Defendants controlled the power to dispose of virtually all of Blake's stock.

55. To sell stock in the market, the Platform Defendants had to deposit that stock into brokerage accounts in the names of the selling nominee entities. The Platform Defendants were careful to limit their deposits of stock of a particular company at any given time to amounts below 5% for accounts with the same listed beneficial owner. For example, the following text messages were exchanged between Ciapala and Bajic on July 23, 2018, when they were discussing the deposit of shares into brokerage accounts of nominees controlled by Bajic and Taneja:

| | |
|---|---|
| **Ciapala** | Hi, do Fountain [Fountain Drive] and Tamarind [Tamarind Investments] had (sic) same signatories? |
| **Bajic** | Hi, yes both RT [Rajesh Taneja] |
| **Ciapala** | Thx. We agree it's different BO's [beneficial owners]? |
| **Bajic** | No, both same BO [beneficial owner], rajer [Taneja] |
| **Ciapala** | We should be cautious we don't put 2 x 5% |
| **Bajic** | Yes, for bear [near] term, we can only do one 5%. New BO [beneficial owner] broker accts in Sing [Singapore] hopefully any day now |
| **Ciapala** | Ok, thx Just looking out for raj [Taneja] |
| **Bajic** | 100% |

56. The complex network of ownership created by the Platform Defendants' use of numerous nominee entities created issues when they tried to return the proceeds of their illegal

stock sales to their control group clients. The Platform Defendants had to arrange multiple disbursements of large sums of money from various bank accounts that were held in the names of their nominee entities to bank accounts of entities that were owned and controlled by their control group clients. The number and size of these disbursements drew the attention of the disbursing banks on several occasions, and the banks sent inquiries to the nominee entities about the purposes of the requested disbursements. Communications between Bajic and Taneja reveal their concern that the nominee entities' accounts may be "shut down" because of the bank's compliance concerns, unless Bajic and Taneja could provide adequate justification for the disbursements. Bajic then prepared false invoices to create the appearance that the disbursements were for legitimate business expenses.

**MCKNIGHT AND WISE FACILITATE**
**THE PROMOTION OF STOCK SOLD BY THE PLATFORM DEFENDANTS**

57. Bajic, working in concert with Taneja and acting on behalf of Control Group A, funneled money to stock promoters – who created promotions aimed at increasing investors' interest in the stock that the Platform Defendants intended to sell illegally. The creation of investor demand for this stock was critical to the success of the Platform Defendants' fraud, because without such demand, they would be unable to sell the large quantities of stock they were tasked with selling by their control group clients.

58. McKnight and Wise were the intermediaries who executed this portion of the Platform Defendants' scheme. McKnight and Wise offered two layers of corporate structures to distance the source of the money used to pay stock promoters from the Platform Defendants and their control group clients. McKnight and Wise knew, or were reckless in not knowing, that stock promoters typically identify the paying party in public stock promotional alerts. And, McKnight and Wise knew, or were reckless in not knowing, that investors would find it

important to know if the person paying for the stock promotion (*i.e.*, entities controlled by Bajic and/or Taneja) is also involved in selling that stock.

59.     The pattern described in subparagraphs i-viii below obscured the source of stock promotion payments for Blake, and for at least three other securities whose shares were dumped by the Platform Defendants between December 2016 and June 2017:

   i.   Bajic and/or Taneja transferred $4,050,000 from the accounts of the nominees they controlled, and that was held for the benefit of Control Group A, to a Singapore-based entity controlled, directly or indirectly, by McKnight;

  ii.   Bajic created false invoices to create the false appearance that the transfers to McKnight's entity were for legitimate services when, in actuality, Bajic was concealing the fact that he was transferring money for stock promotional activity on behalf of Control Group A;

 iii.   McKnight hired Wise to create an online presence for McKnight's entity to make it appear legitimate, and Wise built a generic website for the company at McKnight's direction;

  iv.   McKnight coordinated the transfer of $3,682,480 of the money he received from Bajic and/or Taneja to an entity controlled by Wise, keeping $367,520 for himself;

   v.   Wise, at McKnight's direction, then transferred $3,373,500 to a company that hired other stock promoters (the "Stock Promotion Arranger").  The Stock Promoter Arranger hired others to tout four of the publicly traded companies whose stock the Platform Defendants planned to (and did) sell.  For performing this service, Wise kept $308,980 for himself;

    vi.   Wise never spoke with the Stock Promotion Arranger about the stock promotions;

    vii.   McKnight was the sole point of contact to coordinate with the Stock Promotion Arranger about the budget for and timing of each of the stock promotional campaigns, and McKnight also chose the creative content providers for those promotions; and

    viii.   The Stock Promotion Arranger routinely asked McKnight to supply the name of the third party paying for each promotion because that information was typically disclosed in the promotional materials.  In response to those questions, McKnight gave the Stock Promotion Arranger false names of the paying entities. When he did this, McKnight knew or recklessly disregarded that the promoters would routinely use the false information supplied by McKnight to identify the paying parties on each promotion, thereby further obscuring the source of the funds.

60.    The following example, specific to Blake, illustrates this deceptive series of practices:

    i.   On or about December 7, 2016, Bajic, directly or indirectly, transferred $300,000 from an account in the name of defendant Island Fortune Global Ltd., a nominee he owned, to a bank account held in the name of the Singapore entity controlled by McKnight.

    ii.   On or about January 4, 2017, McKnight coordinated the transfer of $250,000 to a bank account controlled by Wise.

iii. Also on or about January 4, 2017, McKnight told Wise, in sum and substance, that the $250,000 was for a stock promotional campaign directed at Blake stock. McKnight also directed Wise to send virtually all of the money to the Stock Promotion Arranger.

iv. Wise did as directed and kept a cut of the $250,000 for himself. Specifically, on or about January 4, 2017, Wise transferred approximately $242,500 to the Stock Promotion Arranger, but did not talk with the Stock Promotion Arranger about Blake.

v. At or about the same time, McKnight, in an effort to further disguise the true source of the funds, falsely informed the Stock Promotion Arranger that an entity called Rich Team Consultants Private Ltd. was responsible for paying for the Blake promotion. In actuality, as McKnight knew or was reckless in not knowing, Control Group A—through Bajic and/or Taneja—was the source of the funds.

vi. The Stock Promotion Arranger initiated the Blake promotional campaign on or about January 9, 2017, and instructed the stock promoters—as directed by McKnight—to name Rich Team Consultants Private Ltd. as the paying party on the promotions.

61. Between approximately December 1, 2016 and January 6, 2017 (the last trading prior to the start of the promotion), approximately 20,000 shares of Blake stock traded daily in the market on average. During the course of the stock promotional campaign managed by the Stock Promotion Arranger, which ended on March 3, 2017, the average daily volume of Blake shares traded increased to approximately 534,000 shares.

62. Wise, directly or indirectly, paid over $1.4 million to the Stock Promoter Arranger between January 4, 2017 and February 24, 2017, which money was used to promote Blake stock during the promotional campaign. McKnight, directly or indirectly, provided all of the funding to Wise. And, Bajic and/or Taneja, in turn, directly or indirectly, provided all of that funding to McKnight for the Blake stock promotional campaign.

63. Wise substantially assisted in the scheme to secretly sell Control Group A's stock. Wise offered his bank account as a front for McKnight further to disguise the source of the funds used for stock promotional services.

64. Both McKnight and Wise knew, or were reckless in not knowing, that they were substantially assisting the efforts of the Platform Defendants and Control Group A to sell stock illegally in connection with the Blake promotional campaign. Indeed, they acted as conduits to obscure the source of funds transferred to them by Bajic and/or Taneja.

65. In sworn testimony, Wise later acknowledged that he had "considered" the possibility that the millions of dollars he paid to the Stock Promotion Arranger may have been sourced from "the main investor in that company and they are trying to turn it around."

**THE PLATFORM DEFENDANTS DUMP CONTROL GROUP A'S STOCK**

66. As the table below reflects, from January 9, 2017 through March 3, 2017, the Platform Defendants coordinated the sale of Control Group A's Blake stock with the stock promotion for which Bajic and/or Taneja directed funds. The Platform Defendants orchestrated the sale of Blake stock through Crystalmount Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., and Norfolk Heights Ltd., and at least two Offshore Nominees controlled by Blacklight SA.

| Nominee | Platform | Shares Sold | Proceeds Generated |
|---|---|---|---|
| Crystalmount Ltd. | Bajic-Taneja Platform | 1,380,000 | $ 1,254,960 |
| Fountain Drive Ltd. | Bajic-Taneja Platform | 808,100 | $ 709,763 |
| Island Fortune Global Ltd. | Bajic-Taneja Platform | 22,193 | $ 19,339 |
| Norfolk Heights Ltd. | Bajic-Taneja Platform | 540,500 | $ 468,817 |
| Offshore Nominee A | Blacklight SA | 1,380,000 | $ 1,782,824 |
| Offshore Nominee B | Blacklight SA | 1,150,751 | $ 1,058,877 |
| **TOTAL** | | **5,281,544** | **$ 5,294,581** |

67.     The Platform Defendants knew, or were reckless in not knowing, that they were selling stock for Control Group A without an effective registration statement and without complying with the provisions of SEC Rule 144.  Indeed, they went to great lengths to obscure the fact that they were selling stock for Control Group A.

68.     In or about April 2017, after the promotional campaign ended, the stock price and trading volume of Blake declined.  In order artificially to prop up the stock price and volume, the Platform Defendants engaged in coordinated trading designed to induce investors to buy Blake stock.

69.     As the table below illustrates, the Platform Defendants bought and sold stock from each other.  These sales served no legitimate purpose and were designed to create the false appearance that there was actual market demand for Blake stock.  Indeed, Bajic and Taneja used Fountain Drive Ltd. (Taneja's entity), Wisdom Chain Ltd. (Bajic's entity), and Norfolk Heights Ltd. (Person A's entity on paper, but actually controlled by Bajic) to coordinate trading with entities controlled by Blacklight SA.

| Date | Sales by Bajic-Taneja Platform | Purchases by Blacklight SA | Coordinated Trades | Total Market Volume | Coordinated Trades as % of Market Volume |
|---|---|---|---|---|---|
| 4/26/2017 | 256,108 | 232,500 | 232,500 | 506,602 | 46% |
| 4/27/2017 | 482,900 | 500,000 | 482,900 | 647,083 | 75% |
| 4/28/2017 | 474,600 | 240,000 | 240,000 | 1,043,100 | 23% |
| 5/1/2017 | 23,000 | 35,500 | 23,000 | 86,813 | 26% |
| 5/22/2017 | 101,000 | 165,000 | 101,000 | 470,223 | 21% |
| 5/23/2017 | 45,300 | 91,000 | 45,300 | 388,046 | 12% |

70. In and after April 2017, the Platform Defendants continued to sell Blake stock to investors even though there was no effective registration statement and without complying with the conditions of SEC Rule 144.

71. Overall, the Platform Defendants illegally sold at least 7.2 million shares of Blake stock generating gross proceeds of at least $7.2 million. The Platform Defendants shared in the illegal proceeds generated from these sales as they were paid commissions for their work to generate these proceeds.

**SALES OF OTHER COMPANIES' STOCK**

72. During the Relevant Period, the Platform Defendants illegally sold the stock of various publicly traded companies without an exemption from registration or effective registration in effect with the Commission pursuant to Section 5 of the Securities Act.

73. In addition to the offshore nominee entities that Bajic and Taneja used to sell Blake stock, Bajic and Taneja also used at least three other foreign nominee entities to hold and trade stock illegally for control groups of public companies:

a. SSID Ltd.: SSID Ltd. identified Taneja as its principal in corporate documents and Taneja signed a corporate resolution on behalf of SSID Ltd. in connection with the transfer of shares of Pacificorp Holdings Ltd. (ticker: PCFP) to a brokerage account;

b.   Wisdom Chain Ltd.:  Wisdom Chain Ltd. identified Bajic as its principal in corporate documents and Bajic signed a corporate resolution on behalf of Wisdom Chain Ltd. in connection with the transfer of shares of Drone Guarder, Ltd. (ticker: DRNG) to a brokerage account; and,

c.   Sure Mighty Ltd.:  Sure Mighty Ltd. identified Person B as its principal in corporate documents; however Person B was merely a person working on behalf of Bajic and Taneja in an administrative capacity.  Person B and Bajic jointly signed an "irrevocable stock power" form transferring shares of Zenosense, Inc. (ticker: ZENO) in order to deposit the shares into a Sure Mighty Ltd. brokerage account.  Sure Mighty Ltd., Wisdom Chain Ltd., Tamarind Investments Inc. and Blacklight SA all sold ZENO shares on or about the same days in April 2017.  Bajic and Taneja shared commissions with Blacklight SA from the sales of Sure Mighty's ZENO shares.

74.    The table set forth below identifies examples, without limitation, of sales by the Platform Defendants for which no effective registration statement was filed.  Each example in the table illustrates how control persons transferred, directly or indirectly, unregistered stock to nominee companies which the nominee companies subsequently sold after the unregistered stock was deposited with brokers (i.e., "Shares Available for Trading").  By doing so, the Platform Defendants acted as underwriters in that they distributed stock on behalf of control persons. And, on each occasion, no registration exemption applied, and the control persons, as well as the Platform Defendants, failed to comply with the conditions of SEC Rule 144.

| Issuer | Location | Date of First Transfer | Nominees Used to Aggregate Shares | Cumulative Shares Controlled by Bajic-Taneja Platform and Blacklight SA Deposited with Brokers | Total Shares Available for Trading As of Last Deposit | Bajic-Taneja Platform's and Blacklight SA's Percentage of Shares Available for Trading | Minimum Gross Proceeds to Bajic-Taneja Platform and Blacklight SA |
|---|---|---|---|---|---|---|---|
| BKIT | New York, NY | 7/9/2015 | 7 | 9,207,572 | 9,208,572 | 99.99% | $ 7,270,347 |
| PCFP | Seattle, WA | 4/26/2017 | 4 | 9,420,000 | 9,480,000 | 99.37% | $ 4,362,535 |
| DRNG | London, UK | 7/6/2015 | 4 | 24,765,000 | 34,855,480 | 71.05% | $ 4,248,170 |
| VIBI | New York, NY | 9/6/2016 | 5 | 12,300,000 | 15,000,000 | 82.00% | $ 3,055,573 |
| BLTO | Las Vegas, NV | 2/24/2017 | 6 | 10,133,519 | 10,581,429 | 95.77% | $ 2,378,360 |
| GLBB | Centennial, CO | 4/5/2017 | 2 | 900,000 | 1,815,000 | 49.59% | $ 846,202 |
| SPRN | Rockville Centre, NY | 2/19/2016 | 3 | 8,692,800 | 20,241,615 | 42.95% | $ 685,502 |
| **TOTAL** | | | | | | | **$ 22,846,690** |

75. In July 2018, Bajic, Taneja and the entities they controlled faced elevated compliance scrutiny from their primary brokerage firm in Hong Kong. As a result, Bajic and Taneja worked to move securities from their accounts at that brokerage firm to accounts at other firms. During this process, Bajic communicated with Killarney via an encrypted communication application. The following communication from July 2018 demonstrates how they used their own, and each other's, nominee entities interchangeably as part of a coordinated dump of shares that were, nominally, held by separate entities:

| | |
|---|---|
| **Bajic** | [The Hong Kong brokerage firm] giving me more headaches on reverse dwacs. Asking lots of questions. I had another call with [the broker] and he's going to help push them. Should be ok on stuff in crystal mount[], island [fortune global] and wisdom [chain]. Norfolk is still a problem |
| **Killarney** | Ok for NH [Norfolk Heights]. Maybe it's forget about it time. Vibi [VIBI – a microcap issuer listed in table above] is important to us obviously so if u can get me 1.8m shs [shares] back to us or send elsewhere u have so ready to trade ASAP? |

In this exchange, Killarney suggested that Bajic should return to Blacklight SA the VIBI shares that Norfolk Heights Ltd. possessed, or try to transfer them to another nominee controlled by Bajic and Taneja, so that the shares could "trade ASAP."

**FIRST CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Sections 17(a)(1), (3) of the Securities Act by the Platform Defendants)**

76. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

77. By reason of the conduct described above, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge or state of mind (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

78. By reason of the conduct described above, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA violated Securities Act Section 17(a)(1) and (3) [15 U.S.C. §77q(a)(1), (3)].

**SECOND CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by the Platform Defendants)**

79. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

80. By reason of the conduct described above, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA

directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

81. By reason of the conduct described above, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a), (c)] thereunder.

**THIRD CLAIM FOR RELIEF**
**UNREGISTERED OFFERINGS OF SECURITIES**
**(Violations of Sections 5(a) and 5(c) of the Securities Act by the Platform Defendants)**

82. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

83. By reason of the conduct described above, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer

to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, one or more of the securities identified in Paragraph 74, as to which no registration statement has been filed and for which no exemption from registration has been available.

84. As a result, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Platform Defendants' Aiding and Abetting of Violations of Sections 5(a), (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by various Control Groups)**

85. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

86. By reason of the conduct described above, control persons, including Control Group A, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

87. By reason of the conduct described above, control persons, including Control Group A, directly or indirectly (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and

for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the stock of Blake, as to which no registration statement has been filed and for which no exemption from registration has been available.

88.     By reason of the conduct described above, control persons, including Control Group A, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

89.     Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA knowingly or recklessly provided substantial assistance to control persons, including Control Group A, in their violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act.

90.     As a result, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA aided and abetted violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act, and Section 10(b) and Rules

10b-5(a) and (c) under the Exchange Act, as proscribed by Section 15(b) the Securities Act [15 U.S.C. §77o(b)] and Section 20(e) the Exchange Act [15 U.S.C. §78t(e)].

**FIFTH CLAIM FOR RELIEF**
**UNREGISTERED BROKER-DEALER**
**(Violations of Section 15(a)(1) by the Platform Defendants)**

91. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

92. Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, by engaging in the conduct described above, directly or indirectly, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without being registered as a broker or dealer in accordance with Section 15(b) of the Exchange Act [15 U.S.C. §78o(b)].

93. As a result, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA violated and, unless enjoined, will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)(1)].

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO REPORT OVER 5% BENEFICIAL OWNERSHIP**
**(Violations of Section 13(d)(1) by the Platform Defendants)**

94. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

95. During the Relevant Period, the stock of Blake was a security under Section 3(a)(1) of the Exchange Act [15 U.S.C. §78c(a)(10)].

96.     During the Relevant Period, Blake had equity securities that were registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §78l].

97.     By reason of the conduct described above, defendants Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, after acting as a group to acquire directly or indirectly beneficial ownership of more than 5 percent of a class of Blake equity securities, failed to file statements with the Commission containing the information required by Schedule 13D [17 C.F.R. §240.13d-101] within ten days after they acquired such shares, or at all.

98.     By reason of the conduct described above, defendants Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, after acting as a group to acquire directly or indirectly beneficial ownership of more than 5 percent of a class of Blake equity securities, disposed of beneficial ownership of 1 percent or more of that class of equity securities and failed to file with the Commission an amendment disclosing this material change.

99.     As a result, Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA violated and, unless enjoined, will continue to violate Section 13(d)(1) of the Exchange Act [15 U.S.C. §78m(d)(1)].

**SEVENTH CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**
**(Violations of Section 17(a)(3) of the Securities Act by McKnight)**

100.    Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

101.    By reason of the conduct described above, defendant McKnight, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting at least negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

102.    By reason of the conduct described above, McKnight violated Securities Act Section 17(a)(3) [15 U.S.C. §77q(a)(3)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(McKnight's Aiding and Abetting of Violations of Sections 5(a), (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by the Platform Defendants and various Control Groups)**

103.    Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

104.    By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

105.    By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities, including, but not limited to, the stock of Blake, as to which no registration statement has been filed and for which no exemption from registration has been available.

106.    By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

107.    Defendant McKnight knowingly or recklessly provided substantial assistance to the Platform Defendants and/or control persons, including Control Group A, in their violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act.

108. As a result, McKnight aided and abetted violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act, and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act, as proscribed by Section 15(b) the Securities Act [15 U.S.C. §77o(b)] and Section 20(e) the Exchange Act [15 U.S.C. §78t(e)].

**NINTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Wise's Aiding and Abetting of Violations of Sections 5(a), (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) by the Platform Defendants and various Control Groups)**

109. Paragraphs 1 through 75 above are re-alleged and incorporated by reference as if fully set forth herein.

110. By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly, in the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

111. By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or

otherwise, securities, including, but not limited to, the stock of Blake, as to which no registration statement has been filed and for which no exemption from registration has been available.

112. By reason of the conduct described above, the Platform Defendants and control persons, including Control Group A, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

113. Defendant Wise knowingly or recklessly provided substantial assistance to the Platform Defendants and/or control persons, including Control Group A, in their violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act.

114. As a result, Wise aided and abetted violations of Sections 5(a) and (c), and 17(a)(1) and (3) of the Securities Act, and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act, as proscribed by Section 15(b) the Securities Act [15 U.S.C. §77o(b)] and Section 20(e) the Exchange Act [15 U.S.C. §78t(e)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently enjoin Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, Blacklight SA, McKnight and Wise, and their officers, agents, servants, employees and attorneys, and those persons in active concert or

participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), (c), and 77q], and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5].

      B.     Permanently restrain Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 13(d) and 15(a) of the Exchange Act [15 U.S.C. §§78m(d)(a), 78(o)(a)(1)].

      C.     Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

      D.     Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

      E.     Enter an order barring Bajic, Taneja, Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty Ltd., Tamarind Investments Inc., Ciapala, Killarney, and Blacklight SA from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. §78u(d)];

      F.     Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

G. Grant such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED: January 2, 2020.

Respectfully submitted,

/s/ Alicia Reed

Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)
Rebecca Israel (NY Bar No. 4783304)
Eric A. Forni (Mass Bar No. 669685)
David M. Scheffler (Mass Bar No. 670324)
J. Lauchlan Wash (Mass Bar No. 629092)
Jonathan Allen (Mass Bar No. 680729)
Amy Gwiazda (Mass Bar No. 663494)

SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: 617-573-8904 (Shields), 617-573-4582 (Israel), 617-573-8827 (Forni)
Fax: 617-573-4590
shieldska@sec.gov; fornie@sec.gov; israelr@sec.gov