UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  Plaintiff,  v.  STEVE M. BAJIC, RAJESH TANEJA, NORFOLK HEIGHTS LTD., FOUNTAIN DRIVE LTD., ISLAND FORTUNE GLOBAL LTD., CRYSTALMOUNT LTD., WISDOM CHAIN LTD., SSID LTD., SURE MIGHTY LTD., TAMARIND INVESTMENTS INC., KENNETH CIAPALA, ANTHONY KILLARNEY, BLACKLIGHT SA, CHRISTOPHER LEE MCKNIGHT, and AARON DALE WISE,  Defendants. | Civil Action No. 20-cv-00007-LGS |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR AN
ORDER FREEZING AND REPATRIATING ASSETS**

Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)
Rebecca Israel (NY Bar No. 4783304)
Eric A. Forni (Mass Bar No. 669685)
Amy Gwiazda (Mass Bar No.663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct);
(617) 573-4582 (Israel direct)
Fax: (617) 573-4590 (fax)
shieldska@sec.gov; israelr@sec.gov

## TABLE OF CONTENTS

PRELIMINARY STATEMENT     1

STATEMENT OF FACTS     2

I.    Statutory Framework Concerning the Sale of Securities: Control Persons, Restrictions on Sales, and Issuer Disclosure Requirements     2

II.    Bajic and Taneja Illegally Sold Stock     4

  A.  Bajic and Taneja's Network of Nominee Entities     4

  B.  Coordination with Ciapala, Killarney and Blacklight SA     5

III.    The Blake Example     6

  A.  Control Group A Gained Possession of Virtually all of Blake's Stock     6

  B.  The Platform Defendants Took Possession of Virtually all of Blake's "Free Trading" Stock     8

  C.  Bajic and Taneja Transferred Funds for Blake Stock Promotions     8

  D.  Bajic and Taneja Dumped Control Group A's Blake Stock     9

  E.  Bajic and Taneja Coordinated with Blacklight to Artificially Prop Up the Price and Volume of Blake Stock     9

  F.  Via this Scheme, Control Group A Generated Proceeds and Bajic and Taneja Took a Commission, Which they Shared with Blacklight     10

IV.    Bajic and Taneja Sold Numerous Other Companies' Stock Without an Effective Registration Statement, In Coordination with Blacklight     11

  A.  Seven Other Examples     11

  B.  Coordination Between Bajic, Taneja and Blacklight     12

  C.  Bajic Created False Invoices to Justify Payments to the Platform's Control Group Clients     13

ARGUMENT     14

I.    The Commission is Likely to Succeed on its Claims that the Bajic-Taneja

Defendants Violated the Antifraud Provisions of the Securities Act and
Exchange Act                                                                  14

A.  The Bajic-Taneja Defendants Engaged in a Fraudulent Scheme                15

B.  Bajic and Taneja Acted with Scienter                                      16

    1.  Bajic and Taneja Knew They Were Selling Stock for Undisclosed
Control Groups                                                                16

    2.  Bajic and Taneja Were Aware of the Limitations on Sales of Stock    17

    3.  Bajic and Taneja Knew They Were Working in Concert with Blacklight  18

C.  The Bajic-Taneja Defendants' Fraud was "In Connection With" the Purchase or
Sale of Securities                                                           18

II.    The Commission Is Likely to Succeed on its Claims that the Bajic-Taneja
Defendants Violated the Registration Provisions of the Securities Act.        19

III.   The Commission Is Likely to Succeed on its Claims that the Bajic-Taneja Defendants
Violated Section 13(d) of the Exchange Act.                                   21

IV.    The Court Should Freeze Assets Belonging to the Bajic-Taneja Defendants to
Prevent Their Dissipation.                                                    22

V.     The Court Should Enter an Order to Repatriate Assets From Foreign
Jurisdictions.                                                                24

CONCLUSION                                                                    25

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980)............................................................................................15

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)................................................................14, 16

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................................................16

*In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236 (S.D.N.Y. 2007)........................................14

*Int'l Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974) .......................................................24

*In the Matter of Lexington Res., Inc., et al.*, SEC Release No. 379, 2009 WL 1684743, (June 5, 2009)..............................................................................................................................................22

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ......................................................................................15

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290 (S.D.N.Y. 2015) ..........................................19

*SEC v. Cavanaugh*, 445 F.3d 105 (2d Cir. 2006) .........................................................................19

*SEC v. China Northeast Petroleum Holdings, Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ...........15

*SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738 (2d Cir. 1941)........................ 19-20

*SEC v. Credit Bancorp Ltd.*, No. 99-Civ-11395, 2010 WL 768944 (S.D.N.Y. Mar. 8, 2010)..............................................................................................................................................24

*SEC v. Czarnik*, No. 10-Civ-745, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010).........................20

*SEC v. Dubovoy*, No. 15-cv-6076, 2015 WL 6122261 (D.N.J. Oct. 16, 2015)............................23

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996)..................................................15, 24

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ..........................................................................20

*SEC v. Jafar*, 13-CV-4645, 2015 WL 3604228 (S.D.N.Y. June 8, 2015) ...................................22

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ......................................................................15

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) ....................................................7, 21

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................................24

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ....................................................15

*SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*, 296 F.R.D. 241 (2d Cir. 2013) ...........................................................................................................23

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013)............................................15

*SEC v. Subaye, Inc.,* No. 13-Civ-3114, 2014 WL 448414 (S.D.N.Y. Feb. 4, 2014)....................19

*SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007).........................................3, 20

*SEC v. Unifund SAL.*, 910 F.2d 1028 (2d Cir. 1990) ....................................................................24

*SEC v. Zandford*, 535 U.S. 813 (2002) .........................................................................................19

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011).......................................................................14, 22, 23

*Zacharias v. SEC*, 569 F.3d 458 (D.C. Cir. 2009) .......................................................................20

**Statutes and Rules**

Securities Act of 1933 ("Securities Act") §2(a)(11), 15 U.S.C. §77b ..........................................21

Securities Act §4, 15 U.S.C. §77d ..................................................................................................2

Securities Act §5, 15 U.S.C. §77e .......................................................................................... 2, 19-21

Securities Act §7, 15 U.S.C. §77g ..................................................................................................3

Securities Act §17(a), 15 U.S.C. §77q(a) .......................................................................... 14-16, 19

Exchange Act of 1934 ("Exchange Act") §10(b), 15 U.S.C. §78j ....................................14, 16, 19

Exchange Act §12(g), 15 U.S.C. §78l(g)................................................................................ 7, 21-22

Exchange Act §13(d), 15 U.S.C. §78m(d)........................................................................... 3, 8, 21-22

Exchange Act §21, 15 U.S.C. §78u ................................................................................................24

SEC Rule 144, 17 C.F.R. §230.144 ........................................................................2, 3, 7, 8, 10, 17

SEC Rule 10b-5, 17 C.F.R. §240.10b-5 ................................................................................14, 16

SEC Rule 13d-1, 17 C.F.R. §240.13d-1 ............................................................................ 7, 21-22

SEC Rule 13d-3, 17 C.F.R. §240.13d-3 ......................................................................................22

Plaintiff Securities and Exchange Commission (the "Commission"), submits this memorandum of law, as well as the Declaration of Trevor Donelan ("Donelan Decl.") and related exhibits, in support of its motion for an order freezing and repatriating assets belonging to defendants Steve M. Bajic ("Bajic"), Rajesh Taneja ("Taneja"), Norfolk Heights Ltd. ("Norfolk Heights"), Fountain Drive Ltd. ("Fountain Drive"), Island Fortune Global Ltd. ("Island Fortune"), Crystalmount Ltd. ("Crystalmount"), Wisdom Chain Ltd. ("Wisdom Chain"), SSID Ltd. ("SSID"), Sure Mighty Ltd. ("Sure Mighty"), and Tamarind Investments Inc. ("Tamarind") (collectively, the "Bajic-Taneja Defendants").

## PRELIMINARY STATEMENT

This case concerns a fraudulent scheme in which Bajic and Taneja coordinated with other defendants illegally to dump the stock of public microcap companies on behalf of undisclosed persons who controlled those companies ("control groups").  Bajic, Taneja, and others disguised the stock ownership of control groups by using a layer of nominee corporations to transfer and sell stock controlled by those control groups into the market, in contravention of the registration and disclosure requirements imposed by the federal securities laws.  From at least July 2015 to June 2019 (the "relevant period"), Bajic and Taneja, working with their co-defendants, orchestrated the coordinated dumping of shares of at least 45 public companies, for net trading proceeds of about $35 million.  In addition, the Bajic-Taneja Defendants engaged in the same type of illegal dumping of the stock of dozens of other companies without coordinating with their co-defendants, for net trading proceeds of at least $7.7 million.

The Commission seeks an asset freeze against Bajic, Taneja, and the companies they control. To date, the Commission has been able to identify approximately $42 million in illicit trading proceeds received either by the Bajic-Taneja Defendants or jointly by the Bajic-Taneja

Defendants and their co-defendants, as a result of the trading described in the Complaint. *See* Donelan Decl. ¶9.  There is a likelihood that these assets will be dissipated, and the Commission seeks an asset freeze to ensure that these funds can be collected for distribution to hundreds of investor victims.  The Commission is likely to succeed on the merits of showing that the Bajic-Taneja Defendants repeatedly have violated the federal securities laws.

## STATEMENT OF FACTS

I.   **STATUTORY FRAMEWORK CONCERNING THE SALE OF SECURITIES: CONTROL PERSONS, RESTRICTIONS ON SALES, AND ISSUER DISCLOSURE REQUIREMENTS**

Before stock can be sold to the public, the person issuing or selling the stock must either (a) register that stock with the Commission pursuant to Section 5 of the Securities Act of 1933 ("Securities Act"); (b) rely on an exemption from registration; or (c) comply with the sale conditions outlined in Commission Rule 144, which provides a safe harbor for selling unregistered stock.  *See* 15 U.S.C. §§77d, 77e; 17 C.F.R. §230.144.  Importantly, even if a public company registers its stock at the time it issues that stock to its investors, those investors *must* comply with the registration, exemption, or safe harbor rules before distributing (selling) that stock to other investors.  *See, e.g.*, §230.144 (preamble).

"Restricted stock" is stock of a publicly traded company (also known as an "issuer") acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission.  Stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  *See* 15 U.S.C. §77e.  A registration statement contains important information about an issuer's business operations, financial

condition, results of operation, risk factors, and management. *See* 15 U.S.C. §77g. It also discloses any person or group who beneficially owns more than 5% of the company's securities.

An "affiliate" of an issuer is a person, entity or group that, "directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer" (*i.e.*, a control group). Rule 144(a)(1), 17 C.F.R. §230.144(a)(1). Typically, affiliates include officers, directors and controlling shareholders, but any person who is under "common control" with or has common control of an issuer is also an affiliate.

"Unrestricted stock" is stock that may legally be offered and sold in the public securities marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement. Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement. Registration, therefore, does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties. *See SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007). If a control person buys shares in the company s/he controls, those shares are subject to restrictions and ordinarily require a registration for bulk sales of such shares.

In addition to the foregoing, certain investors must disclose their control of more than 5% of an issuer's outstanding shares. *See* 15 U.S.C. §78m. Public companies who are required to file periodic reports with the Commission, including on Commission Form 10-K, must also accurately disclose shareholders who own more than 5% of the company's outstanding shares. *See* 15 U.S.C. §78m(d)(1).

## II.      BAJIC AND TANEJA ILLEGALLY SOLD STOCK

### A.      Bajic and Taneja's Network of Nominee Entities

Bajic, a dual citizen of Canada and Croatia and a resident of Canada, and Taneja, a

Canadian citizen, and resident of Vietnam, used a network of eight foreign companies -- Norfolk

Heights, Fountain Drive, Island Fortune, Crystalmount, Wisdom Chain, SSID, Sure Mighty, and

Tamarind (collectively, the "Bajic-Taneja Entities") -- to operate a "trading platform," a business

whose primary purpose was to facilitate illegal securities transactions in United States securities

markets to the detriment of the market and unsuspecting retail investors.  These transactions

involved unregistered sales of securities of at least seven issuers. *See* Donelan Decl. ¶14.

Bajic and Taneja set up their trading platform as a network of separate corporate entities.

*See id*. ¶¶15-21.  This structure gave the appearance that distinct corporate entities were selling

shares of the same issuer.  However, Bajic and Taneja operated the Bajic-Taneja Entities as a

single enterprise and treated the entities' assets as fungible. *See id.* ¶¶24-25; *id.*, Ex. 8.

Bajic is listed on corporate documents as the owner of three of the Bajic-Taneja Entities:

(1) Island Fortune, (2) Crystalmount, and (3) Wisdom Chain, which are all Seychelles

corporations with registered addresses in Hong Kong.  *See id.*, Exs. 1-3.  When Bajic opened

bank or brokerage accounts on behalf of these companies, he claimed that he was using them as

personal investment vehicles.  *See, e.g., id.,* Ex. 1 at 4 ("This company is set up as a personal

investment company. [Bajic] is going to use his personal wealth to invest in listed equities in

European markets.").  Bajic used these entities to sell shares of many issuers' stock, including

(for Island Fortune and Crystalmount) the stock of Blake Insomnia Therapeutics, Inc. ("Blake"),

and tracked the commissions that he and Taneja earned on those sales.  *See id.*, ¶¶13, 19, 37-38.

Taneja is listed on corporate documents as the owner of three other Bajic-Taneja Entities:

(1) Fountain Drive, (2) SSID, and (3) Tamarind.  Fountain Drive is a Seychelles corporation with registered address in Hong Kong; SSID is incorporated and has a registered address in Hong Kong; and Tamarind is an Anguilla corporation with registered addresses in Hong Kong and Thailand.  *See id.*, Exs. 4-6. When Taneja opened bank or brokerage accounts on Fountain Drive's behalf, he claimed that he was using Fountain Drive as a personal investment vehicle. *See e.g., id.,* Ex. 4 at 4 ("This company is set up as a personal investment company. [Taneja] is going to use his personal wealth to invest in listed equities in European markets.").  These three entities also sold many issuers' stock, and the commissions that Bajic and Taneja earned on those sales were tracked on Bajic's electronic spreadsheets.  *See id.* ¶¶13, 19, 37-38.

The remaining two Bajic-Taneja Entities, Norfolk Heights and Sure Mighty, are nominally owned by Person A and Person B respectively.  Person A and Person B stated that their activities on behalf of these entities were directed by Bajic and/or Taneja. *See id.* ¶¶16-17.

Bajic and Taneja operated the Bajic-Taneja Entities as a single enterprise.  Despite their nominally distinct ownership, Bajic directed mail for SSID and Fountain Drive (both nominally owned by Taneja), Norfolk Heights (nominally owned by Person A), and Crystalmount and Island Fortune (nominally owned by Bajic), to a single address in Burnaby, British Columbia. *See id*., Ex. 8.  Bajic and Taneja also communicated about the various offshore nominee accounts as if they were under common control, including one communication between the two in which Bajic referred to defendant Fountain Drive as "our baby since day 1."  *See id*., Ex. 11, excerpt 1. In another communication, Bajic asked Taneja what the "password" was to access the Norfolk Heights email account, which was supposedly operated by Person A.  *See id.,* Ex. 11, excerpt 4.

**B.    Coordination with Ciapala, Killarney and Blacklight, SA**

Bajic and Taneja frequently worked with another trading platform, Blacklight SA

("Blacklight"), which was controlled by defendants Ciapala and Killarney.  Blacklight controlled Offshore Nominees A, B and C.  Blacklight opened brokerage accounts on behalf of each of these offshore entities.  *See id*. ¶18.  Ciapala and Killarney, on behalf of Blacklight, had authority over the brokerage accounts in the names of Offshore Nominees A, B, and C.  *See id.*

When Bajic and Taneja sold stock in coordination with Blacklight, they divided up an issuer's securities between various Bajic-Taneja Entities and various Blacklight-controlled offshore entities.  Thus, for any given public company's shares that were sold by the defendants in coordinated trading, each of the nominal selling entities held less than 5% of that company's outstanding stock.  *See id*. ¶37.  This scheme concealed from market participants that a single control group was dumping a large number of shares in a coordinated fashion.

The Bajic-Taneja Defendants and Blacklight earned fees and commissions ranging from 4-10% of the value of the stock they sold on behalf of control groups.  *See id.* ¶19.  When Bajic and Taneja sold stock of control groups in coordination with Blacklight, Bajic and Taneja shared fees and commissions with Blacklight, often allocating fees and commissions to Blacklight from sales of shares that were ostensibly owned and sold by Bajic-Taneja Entities.  *See id*. ¶¶19, 21.  Bajic and Taneja coordinated with Blacklight to sell the shares of at least 45 companies and thereby earned trading proceeds of over $35 million.  *See id*. ¶9.

## III.    THE BLAKE EXAMPLE

The following example relating to stock of Blake illustrates the typical steps that Bajic and Taneja followed when coordinating with Blacklight to dump a particular issuer's shares.

### A.  Control Group A Gained Possession of Virtually all of Blake's Stock

In or about December 2013, a control group ("Control Group A") gained possession of virtually all of the outstanding stock (approximately 10.6 million shares) of Blake. *See id*. ¶¶30-

31 (describing transfer of 10.6 million shares following single payment from Blacklight-controlled entity).  At the time of these transfers, approximately 9.6 million of the Blake shares bore restrictive legends.  *See id.* ¶31.ii.  In coordinated transactions, those 9.6 million restricted shares were transferred to seven offshore nominee entities and the remaining 1 million shares were transferred to an eighth offshore nominee entity.  *See id.* ¶31.  Shortly thereafter, Blake issued 21 million new shares of restricted stock to Blake's new Chief Executive Officer and a Blake consultant, increasing the total shares outstanding to approximately 31.6 million shares.  *See id.* ¶32. This share issuance served to dilute the percentage of shares held by the offshore nominee companies such that each of them then controlled less than 5% of the total outstanding shares.  *See id.*

On or about December 5, 2014, an attorney working for Blake claimed in a letter to Blake's transfer agent that none of the seven offshore nominee entities were affiliates of Blake.  *See id.*, Ex. 10.  This was inaccurate because, as explained above, all of the stock nominally owned by the seven offshore entities was commonly controlled by a single paying entity.  By virtue of this control, the nominee shareholders were "affiliates" of Blake, and the stock held by those seven nominees was legally restricted from resale.  *See SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018).  Control Group A was required to register that stock, or otherwise comply with the sale conditions of SEC Rule 144, before that stock could be sold into the public securities markets.  It did not do so.  Nevertheless, the attorney's representations in the letter induced Blake's transfer agent to remove the restrictive legend from the stock held by the seven offshore nominee entities.  *See* Donelan Decl., ¶33.  Further, because Blake was registered pursuant to Section 12(g) of the Exchange Act, the nominee shareholders were required to disclose in public filings with the Commission that they were the collective owners of more than

5% of Blake's stock.  *See* 15 U.S.C. §78m(d)(1); 17 C.F.R. §240.13d-1.  They failed to do so.

### B.  The Platform Defendants Took Possession of Virtually all of Blake's "Free-Trading" Stock

As the table below summarizes, through a series of transfers in 2016 and 2017, the Bajic-Taneja Defendants and Blacklight collectively took possession of 99.99% of Blake's purportedly unrestricted stock (or shares available for trading) on behalf of their clients:

| Shareholder | Date Acquired | Platform | Shares Owned | % of Purported Unrestricted Shares |
|---|---|---|---|---|
| Fountain Drive Ltd. | 7/9/2015 | Bajic-Taneja Platform | 1,390,000 | 13.12% |
| Island Fortune Global Ltd. | 7/10/2015 | Bajic-Taneja Platform | 1,370,000 | 12.93% |
| Norfolk Heights Ltd. | 7/21/2016 | Bajic-Taneja Platform | 997,500 | 9.41% |
| Offshore Nominee A | 12/13/2016 | Blacklight SA | 1,380,000 | 13.02% |
| Offshore Nominee B | 12/13/2016 | Blacklight SA | 1,390,072 | 13.12% |
| Crystalmount Ltd. | 12/21/2016 | Bajic-Taneja Platform | 1,380,000 | 13.02% |
| Offshore Nominee C | 2/6/2017 | Blacklight SA | 1,300,000 | 12.27% |
| Tamarind Investments, Inc. | 7/3/2017 | Bajic-Taneja Platform | 1,389,000 | 13.11% |
| **TOTAL** | | | **10,596,572** | **99.99%** |

*See* Donelan Decl. ¶37.

Each individual transfer to a nominee entity in the chart above was in an amount of less than 5% of the total outstanding stock of Blake at the time.  *See id*.  This gave the appearance that none of the entities controlled more than 5% of the stock.  However, Bajic, Taneja and Blacklight, who were working in concert, collectively had the power to dispose, or direct the disposition, of over 5% of Blake's stock.

### C.  Bajic and Taneja Transferred Funds for Blake Stock Promotions

After Bajic, Taneja, and Blacklight gained control of the Blake stock as detailed above, stock promoters ran a campaign to promote Blake's stock to potential buyers.  The promotional campaign, which ran from January 9, 2017 through March 3, 2017, was paid for with funds transferred from the Bajic-Taneja Defendants.  *See id*. ¶¶36, 38.

### D.  Bajic and Taneja Dumped Control Group A's Blake Stock.

From January 9, 2017 through March 3, 2017, Bajic and Taneja orchestrated the sale of Blake stock through Crystalmount, Fountain Drive, Island Fortune Global, and Norfolk Heights (and Blacklight orchestrated the sale of Blake stock through Offshore Nominees A and B). During the Blake promotion, the Platforms were able to liquidate over 5.2 million shares of Blake stock.  There was no registration statement for these sales.

| Nominee | Platform | Shares Sold | Proceeds Generated |
|---|---|---|---|
| Crystalmount Ltd. | Bajic-Taneja Platform | 1,380,000 | $    1,254,960 |
| Fountain Drive Ltd. | Bajic-Taneja Platform | 808,100 | $       709,763 |
| Island Fortune Global Ltd. | Bajic-Taneja Platform | 22,193 | $         19,339 |
| Norfolk Heights Ltd. | Bajic-Taneja Platform | 540,500 | $       468,817 |
| Offshore Nominee A | Blacklight SA | 1,380,000 | $    1,782,824 |
| Offshore Nominee B | Blacklight SA | 1,150,751 | $    1,058,877 |
| **TOTAL** | | **5,281,544** | **$    5,294,581** |

*See id.* ¶38.

### E.  Bajic and Taneja Coordinated with Blacklight to Artificially Prop up the Price and Volume of Blake Stock.

In April 2017, after the promotional campaign ended, the stock price and trading volume of Blake declined.  *See id.* ¶39.  Bajic and Taneja then used Fountain Drive (Taneja's entity), Wisdom Chain (Bajic's entity), and Norfolk Heights (nominally Person A's entity, but actually controlled by Bajic) to coordinate trading with entities controlled by Blacklight, as reflected in the table below:

| Date | Sales by Bajic-Taneja Platform | Purchases by Blacklight SA | Coordinated Trades | Total Market Volume | Coordinated Trades as % of Market Volume |
|------|-------|-------|-------|-------|-------|
| 4/26/2017 | 256,108 | 232,500 | 232,500 | 506,602 | 46% |
| 4/27/2017 | 482,900 | 500,000 | 482,900 | 647,083 | 75% |
| 4/28/2017 | 474,600 | 240,000 | 240,000 | 1,043,100 | 23% |
| 5/1/2017 | 23,000 | 35,500 | 23,000 | 86,813 | 26% |
| 5/22/2017 | 101,000 | 165,000 | 101,000 | 470,223 | 21% |
| 5/23/2017 | 45,300 | 91,000 | 45,300 | 388,046 | 12% |

*See id.* ¶40.  As reflected in the chart above, the coordinated trades had the effect of creating the false appearance that there was actual market demand for Blake stock by increasing the total market volume.  In reality, Bajic, Taneja and Blacklight were significant drivers of the market activity on those dates.  *See id.*

In and after April 2017, Bajic, Taneja and Blacklight continued to sell Blake stock to investors.  *See id.* ¶¶40-41.  There were no effective registration statements for those sales, and none of the sellers complied with the conditions of SEC Rule 144.  Overall, Bajic, Taneja and Blacklight illegally sold at least 7.2 million shares of Blake stock and generated gross proceeds of at least $7.2 million.  *See id.* ¶ 41.

### F. Via This Scheme, Control Group A Generated Proceeds and Bajic and Taneja Took a Commission, Which They Shared with Blacklight.

Bajic maintained electronic accounting ledgers in which he tracked the stock sold by the accounts held by the Bajic-Taneja Defendants.  *See id.* ¶¶19-21.  In his ledgers, Bajic debited and credited balances between the nominees' accounts as if they were fungible.  *See id.* ¶20.  For example, Bajic transferred money into Norfolk Heights' ledger from the ledger of Fountain Drive when the balance in Norfolk Heights' ledger reached zero.  *Id.*  Bajic tracked his and Taneja's sales of Blake stock on one ledger regardless of whether the nominal owner of the selling offshore nominee account was Bajic, Taneja, Person A, or Person B.  *See id.* ¶19.  Bajic

also used his electronic ledgers to track commissions attributable to the sales of Blake stock by the entities that he and Taneja controlled.  *Id.* ¶¶19, 21.

## IV.    BAJIC AND TANEJA SOLD NUMEROUS OTHER COMPANIES' STOCK WITHOUT AN EFFECTIVE REGISTRATION STATEMENT, IN COORDINATION WITH BLACKLIGHT.

### A.  Seven Other Examples

The sales of Blake stock described above is illustrative of Bajic and Taneja's business model during the relevant period.  The table below identifies other examples of stock sold by Bajic and Taneja in coordination with Blacklight during the relevant period without an effective registration statement.  *See id.* ¶¶13-14.

| Issuer | Location | Date of First Transfer | Nominees Used to Aggregate Shares | Cumulative Shares Controlled by Bajic-Taneja Platform and Blacklight SA Deposited with Brokers | Total Shares Available for Trading As of Last Deposit | Bajic-Taneja Platform's and Blacklight SA's Percentage of Shares Available for Trading | Minimum Gross Proceeds to Bajic-Taneja Platform and Blacklight SA |
|---|---|---|---|---|---|---|---|
| BKIT | New York, NY | 7/9/2015 | 7 | 9,207,572 | 9,208,572 | 99.99% | $ 7,270,347 |
| PCFP | Seattle, WA | 4/26/2017 | 4 | 9,420,000 | 9,480,000 | 99.37% | $ 4,362,535 |
| DRNG | London, UK | 7/6/2015 | 4 | 24,765,000 | 34,855,480 | 71.05% | $ 4,248,170 |
| VIBI | New York, NY | 9/6/2016 | 5 | 12,300,000 | 15,000,000 | 82.00% | $ 3,055,573 |
| BLTO | Las Vegas, NV | 2/24/2017 | 6 | 10,133,519 | 10,581,429 | 95.77% | $ 2,378,360 |
| GLBB | Centennial, CO | 4/5/2017 | 2 | 900,000 | 1,815,000 | 49.59% | $ 846,202 |
| SPRN | Rockville Centre, NY | 2/19/2016 | 3 | 8,692,800 | 20,241,615 | 42.95% | $ 685,502 |
| **TOTAL** | | | | | | | $ 22,846,690 |

For each security in the table above, control groups gained control of the issuer and transferred its stock, directly or indirectly, to nominee companies controlled by Bajic, Taneja and/or Blacklight.  Bajic, Taneja and/or Blacklight then used the multiple nominee entities at their disposal to transfer the issuers' stock in amounts below 5% of each issuer's total outstanding stock to selected nominees.  *See id.* ¶14.  The nominees then deposited that stock with foreign broker-dealers to sell stock into the U.S. markets.  In each instance, Bajic, Taneja and/or Blacklight dominated the market for the issuers' stock because they exercised significant control over each company's shares available for trading.

11

**B.  Coordination Between Bajic, Taneja and Blacklight**

Bajic, Taneja, Ciapala and Killarney frequently communicated via encrypted

applications, such as "WhatsApp" and "Threema," to coordinate trading and to make sure that

their activities would have the best chance of evading scrutiny by gatekeepers, who would ask

questions if a nominee held more than 5% of an issuer's stock.

The following are excerpts of a text message exchange between Bajic and Ciapala on

July 23, 2018, where they discussed dividing shares between certain of their nominee entities:

| Ciapala | Hi, do Fountain [Fountain Drive] and Tamarind [Tamarind Investments] had (sic) same signatories? |
| Bajic | Hi, yes both RT [Rajesh Taneja] |
| Ciapala | Thx.  We agree it's different BO's [beneficial owners]? |
| Bajic | No, both same BO [beneficial owner], rajer [Taneja] |
| Ciapala | We should be cautious we don't put 2 x 5% |
| Bajic | Yes, for bear [near] term, we can only do one 5%. New BO [beneficial owner] broker accts in Sing [Singapore] hopefully any day now |
| Ciapala | Ok, thx  Just looking out for raj [Taneja] |
| Bajic | 100% |

*Id.*, Ex. 12, Excerpt 1.

In another exchange between Bajic and Ciapala dated July 11, 2018, they discussed

transferring some shares of an issuer named, Black Cactus Global, Inc. (OTC: BLGI) to the

Bajic-Taneja Platform.

| Ciapala | Do you want to take any blgi [BLGI – a microcap issuer]? |
| Bajic | Any change (sic) it Blgi will move up from Pinks to QB? |
| Ciapala | No  Will stay on pinks.  Seems it's not as easy as before up listing to QB |
| Bajic | We can try to get some in 90% good to go.  Let's use Tamarind |
| Ciapala | BLGI it will be 6mil shares.  Below 5%.  Just need name and address of corp |
| Bajic | Tamarind Investments Inc. |

*Id.* Ex. 12, Excerpt 2.

In July 2018, the Bajic-Taneja Defendants faced elevated compliance scrutiny from their

primary brokerage firm in Hong Kong.  *Id.* ¶25.  As a result, Bajic and Taneja moved securities

from their accounts at that brokerage firm to accounts at other firms.  During this process, Bajic

communicated with Killarney via an encrypted communication application, excerpted as follows:

| Bajic | [The Hong Kong brokerage firm] giving me more headaches on reverse dwacs.[1] Asking lots of questions. I had another call with [the broker] and he's going to help push them. Should be ok on stuff in crystal mount[], island [fortune global] and wisdom [chain]. Norfolk is still a problem |
|-------|---|
| Killarney | Ok for NH [Norfolk Heights].  Maybe it's forget about it time.  Vibi [VIBI – a microcap issuer traded by the defendants] is important to us obviously so if u can get me 1.8m shs [shares] back to us or send elsewhere u have so ready to trade ASAP? |

*Id.* at Ex. 12, Excerpt 3.  In this exchange, Killarney suggested that Bajic should return to

Blacklight the VIBI shares that Norfolk Heights possessed, or try to transfer them to another

nominee controlled by Bajic and Taneja, so that the shares could "trade ASAP." *Id.*

### C. Bajic Created False Invoices to Justify Payments to the Platforms' Control Group Clients.

The fact that Bajic and Taneja operated through a network of entities created problems

when they tried to return the proceeds of their illegal stock sales to their control group clients.

To pay the control groups, Bajic and Taneja needed to arrange multiple disbursements of large

sums of money from various bank accounts held in the names of their nominee entities to bank

accounts of entities that were owned and controlled by their control group clients.  The number

and size of these disbursements drew the attention of the disbursing banks on several occasions,

and the banks asked the nominee entities about the purposes of their requested disbursements.

*See id.* ¶25; Ex. 9.  Communications between Bajic and Taneja reveal their concern that the

nominee entities' accounts may be shut down because of banks' compliance concerns, unless

Bajic and Taneja could provide adequate justification for the disbursements.  *Id.* Ex. 11, excerpts

1-3.  Bajic then prepared false invoices to create the appearance that the disbursements were for

legitimate business expenses.  *Id.* at ¶22; Ex. 7.  Bajic and Taneja needed documentation to show

---

[1] "DWAC" stands for "Deposit/Withdrawal at Custodian."  It is an electronic means to transfer shares to or from a custodian or brokerage account.

that these payments, on paper, reflected as expenses of their own nominee entities.

## **ARGUMENT**

The Court should enter an order freezing and repatriating assets.  To obtain an asset freeze, the Commission must show either (1) a likelihood of success on the merits; or (2) that an inference can be drawn that defendant has violated the federal securities laws.  *See Smith v. S.E.C.*, 653 F.3d 121, 128 (2d Cir. 2011).

**I.     The Commission is Likely to Succeed on its Claims that the Bajic-Taneja Defendants Violated the Antifraud Provisions of the Securities Act and Exchange Act.**

Section 10(b) of the Exchange Act makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ."  15 U.S.C. §78j(b).  "Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith."  *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)).  Rule 10b-5 implements Section 10(b) by making it unlawful: "(a) To employ any device, scheme, or artifice to defraud; . . .  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. §240.10b-5.

Similarly, Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities: "(1) To employ any device, scheme, or artifice to defraud; or . . .  (3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  15 U.S.C. §77q(a).

To establish the Bajic-Taneja Defendants' liability under these antifraud provisions, the Commission must show that, acting with scienter, they engaged in a fraudulent scheme or course of business. *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *SEC v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). The Commission need not plead scienter for a claim under subsection (3) of Section 17(a), for which a showing of negligence is sufficient. *See Aaron v. SEC*, 446 U.S. 680, 695-96 (1980); *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013). Unlike private litigants, "the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud," although, in this case, the evidence demonstrates that investors were, and would continue to be, significantly harmed. *SEC v. Lee,* 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).

The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019). *Lorenzo* defined the term "device," simply as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick." *Id.* (internal quotations and citations omitted). The Court similarly defined "act" and "practice" broadly to include things done, actions and deeds. *See id.* As detailed below, the Bajic-Taneja Defendants' conduct satisfies each of these elements. Their conduct was deliberate and complex, and was designed to conceal, obfuscate and mislead the market and its gatekeepers about the ownership and sales of vast quantities of microcap stock.

### A. The Bajic-Taneja Defendants Engaged in a Fraudulent Scheme

Bajic and Taneja, using their multiple nominee entities, for the benefit of themselves and their control group customers, took numerous acts in furtherance of a coordinated fraud to sell shares belonging to undisclosed control groups, which included circumventing registration

requirements and limitations on the amount of shares they could sell as affiliates.  Among other acts: (1) they routinely used various offshore nominee entities to conceal from brokers, transfer agents, purchasers, and other market participants the fact that shares under common control were being sold by apparently unrelated entities; (2) they coordinated the division of a control group's stock into less-than-5% blocks per nominee seller so that sales of the stock would appear to be ordinary trading transactions, when in reality, purchasers were buying restricted stock from affiliates in an unregistered distribution; (3) they engaged in suspicious trading of Blake stock that seemed coordinated and designed to inflate its price and volume in order to induce others to buy and sell Blake stock; and (4) they sent funds from their nominee entities to stock promoters whose promotions induced investors to purchase stock that Bajic and Taneja then sold on behalf of their clients.  Further, Bajic created false invoices to make it seem as if his disbursements of stock sale proceeds at the direction of control groups were in fact for legitimate services.

Given this evidence, the Commission is likely to succeed in proving that the Bajic-Taneja Defendants engaged in a fraudulent scheme.

### B.  Bajic and Taneja Acted with Scienter.

Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter.  Scienter is the "mental state embracing intent to deceive, manipulate or defraud." *Ernst*, 425 U.S. at 193 n.12.  The law does not require direct evidence of scienter, rather "proof of scienter is often a matter of inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983).

### 1.  Bajic and Taneja Knew They Were Selling Stock for Undisclosed Control Groups.

Bajic and Taneja knew, or were reckless in not knowing, that they were selling stock for undisclosed control groups without an effective registration statement and without complying

with the provisions of SEC Rule 144.  Indeed, they went to great lengths to obscure the fact that

they were selling stock for control groups.  Bajic and Taneja falsely represented, when opening

bank accounts for their nominee entities, that they were using the nominee entities as personal

investment vehicles.  *E.g.* Donelan Decl. Ex. 1 at 4, Ex. 4 at 4.  However, Bajic and Taneja

communicated about the various offshore nominee accounts as if they were under common

control.  *See supra* p. 5.  Bajic also directed all mail for Island Fortune Global, Crystalmount,

Norfolk Heights, SSID and Fountain Drive to his personal address despite the fact that Bajic was

not listed as an owner of Norfolk Heights, SSID or Fountain Drive, *see* supra p. 5, which also

reflects his knowledge that these entities were under common control.

### 2.  Bajic and Taneja Were Aware of the Limitations on Sales of Stock

Bajic and Taneja were aware of the obligations and limitations triggered by the

ownership of more than 5% of an issuer's stock.  To sell stock in the market, they had to deposit

that stock into brokerage accounts in the names of the selling nominees.  They were careful to

limit their deposits of stock of a particular company at any given time to amounts below 5% for

nominees with the same listed beneficial owner.  In electronic texts and chats, the Platform

Defendants discussed the transfers of shares between Blacklight and the Bajic-Taneja Entities

that were made irrespective of the purported beneficial ownership of such shares, and those chats

specifically reflect awareness of the 5% trigger.  *See supra*, p. 12-13.

Bajic's messages on July 23, 2018 specifically reflect concern that entities nominally

owned by Taneja should not possess, collectively, more than 5% of the shares of one issuer, so as

not to trigger the appearance of a reporting requirement or violation on his part.  *See* Donelan

Decl., Ex. 12, Excerpt 1.  These exchanges demonstrate that Bajic and Taneja were aware that,

with Blacklight, (a) they collectively controlled – and had dispositional authority – over more

than 5% of the outstanding shares, and (b) that if they put more than 5% of the shares into entities with the same named beneficial owner (in this instance, Taneja), they would run the risk of limitations on sales and unwelcome inquiries from brokers to Taneja.

### 3.  Bajic and Taneja Knew They Were Working in Concert with Blacklight

Bajic and Taneja also knew they were working in concert with Blacklight to perpetuate this charade.  Bajic's ledgers, found in his residence, show his and Taneja's coordination to sell large blocks of microcap stock.  Bajic used ledgers to track the commissions that his clients owed both him and his co-defendants for sales made through the entities that he and Taneja controlled.   His clients were typically charged 4-10% of trading proceeds, which Bajic then split equally between Bajic, Taneja and Blacklight's principals.  *See supra* p. 6.

Specifically for their Blake sales, Bajic and Taneja knew, or were reckless in not knowing, that the offshore nominee shareholders were a sham designed to disguise the fact that they, together with Blacklight, held (and illegally coordinated sales of) the Blake stock of Control Group A.  Among other factors: (1) the offshore nominee entities controlled by the Platform Defendants received the majority of Blake's purportedly unrestricted stock at or about the same time because the stock was collectively controlled by Control Group A; and (2) the Platform Defendants, directly or indirectly, coordinated the sale of virtually all of Blake's purportedly unrestricted stock without receiving any direction from the supposed shareholders, such as Tamarind Investments, because the stock was, in fact, controlled by Control Group A. *See supra*, p. 8-10.  These facts demonstrate that the Commission is likely to succeed in proving that the Bajic-Taneja Defendants acted with scienter.

### C.  The Bajic-Taneja Defendants' Fraud Was "In Connection With" the Purchase or Sale of Securities.

The Commission is likely to succeed in demonstrating that the Bajic-Taneja Defendants'

conduct was "in connection with the purchase or sale" of a security for Section 10(b) purposes and "in the offer or sale" of a security for Section 17(a) purposes.  All of their conduct was undertaken to induce investors to purchase securities, which were being sold into the market by the Bajic-Taneja Defendants, and thus meets the antifraud provisions' "in connection with" test. *See SEC v. Subaye, Inc.*, No. 13-Civ.-3114, 2014 WL 448414, *6 (S.D.N.Y. Feb. 4, 2014) ("[T]he phrase 'in connection with' is broadly construed . . . . The statement or omission need only be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.") (citation and internal quotation marks omitted); *SEC v. Zandford*, 535 U.S. 813, 825 (2002) (fraudulent conduct occurs in connection with the purchase or sale of a security if transaction and conduct "coincide").

## II.    The Commission Is Likely to Succeed on its Claims That the Bajic-Taneja Defendants Violated the Registration Provisions of the Securities Act.

Section 5(a) of the Securities Act prohibits the direct or indirect sale of securities through the mail or interstate commerce unless a registration statement has been filed and is in effect. Section 5(c) of the Securities Act prohibits the offer to sell securities through the mail or interstate commerce unless a registration statement has been filed.  *See* 15 U.S.C. §77e(a), (c).  A *prima facie* showing of a Section 5(a) or 5(c) violation requires that: (1) no registration statement was filed or is in effect; (2) the defendant directly or indirectly offered to sell the securities; and (3) the offer or sale was made in connection with the use of interstate communications.  *See SEC v. Caledonian Bank, Ltd.,* 145 F. Supp. 3d 290, 305 (S.D.N.Y. 2015) (citing *SEC v. Cavanagh*, 445 F.3d 105, 111 n. 13 (2d Cir. 2006)).

Liability under Section 5 extends to persons who "engaged in steps necessary to the distribution of [unregistered] security issues."  *SEC v. Chinese Consolidated Benevolent Ass'n*,

120 F.2d 738, 741 (2d Cir. 1941).  Courts interpreting the "sale" element have concluded that it may be satisfied by a showing that a defendant was a "necessary participant" or a "substantial factor" in the unregistered sale or offer of sale.  *See Zacharias v. SEC,* 569 F.3d 458, 464-66 (D.C. Cir. 2009) (applying "substantial factor" test); *see also SEC v. Holschuh,* 694 F.2d 130, 139-40 (7th Cir. 1982) ("[T]he relevant inquiry in an enforcement action is whether the evidence shows that the defendant was a substantial and necessary participant in the sales transactions.").  Section 5 violations are strict liability offenses and do not require proof of scienter.  *See SEC v. Czarnik*, No. 10-Civ-745, 2010 WL 4860678, *11 (S.D.N.Y. Nov. 29, 2010).

The requirement for a registration statement applies to each separate offer and sale and does not attach to the security itself; thus, "proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *Universal Exp.,* 475 F. Supp. 2d at 422.  For each of the issuers whose stock was sold by the Bajic-Taneja Defendants, there were no registration statements filed or effective for the offers and sales to the public of the securities that were controlled by them or their control group clients.  *See* Donelan Decl., ¶14.  Though the original shareholders frequently registered their purported resales pursuant to a Form S-1, the Bajic-Taneja Defendants' subsequent sales of that stock on behalf of control groups were not covered by that or any other registration statement.  These unregistered offers and sales were not private offers or sales because they were made through the interstate telecommunications facilities of the over-the-counter market.  Thus, a prima facie case of a Section 5 violation is met.

The Bajic-Taneja Defendants were both "necessary participants" and "substantial factors" in the sale of the relevant securities.  They were the undisclosed sellers, via their nominee entity accounts, to the unwitting buyers who purchased the shares of the companies.

They perpetuated the charade that sales from accounts they controlled were ordinary open market sales of unrestricted shares by, among other things, limiting deposits of each issuer's stock to amounts below 5% for nominees with the same named beneficial owner.  They thereby defrauded investors who reasonably believed that they were making ordinary market purchases of widely-traded stock when, in reality, they were buying the stock of company insiders who were illegally and secretly dumping their shares.  Had the Bajic-Taneja Defendants disclosed their status as affiliates to certain gatekeepers, such as transfer agents and broker-dealers, they likely would have been stymied in their attempt to dump stock.

Further, the control groups were affiliates of issuers like Blake because they controlled its business and/or substantially all of its purportedly unrestricted shares that were available for sale in the U.S. markets.  *See Longfin*, 316 F. Supp. 3d at 759.  Bajic and Taneja acquired restricted shares from affiliates in private transactions for no consideration; thus, their sales on the U.S. market represented the first offering of those shares to the general public.  The Bajic-Taneja Defendants therefore acted as "underwriters" within the meaning of Section 2(a)(11) of the Securities Act by "engaging in steps necessary to the distribution" of the securities on behalf of undisclosed control groups.

Accordingly, the Commission has established a likelihood of proving that the Bajic-Taneja Defendants violated Sections 5(a) and (c) of the Securities Act.

**III.    The Commission Is Likely to Succeed on its Claims That the Bajic-Taneja Defendants Violated Section 13(d) of the Exchange Act.**

Section 13(d)(1) of the Exchange Act and Rule 13d-1 together require disclosure of the identity of any person or group that has acquired beneficial ownership of more than five percent of an equity security registered pursuant to Section 12(g) of the Exchange Act. 15 U.S.C. §78m(d)(1); 17 C.F.R. §240.13d-101.  Entities or individuals must comply with Section 13(d) by

filing a Schedule 13D with the Commission no later than ten business days after they acquire

more than five percent of the class of equity security. *Id.* Scienter is not required to establish a

violation of Section 13(d). *See, e.g., In the Matter of Lexington Res., Inc., et al.*, SEC Release

No. 379, 2009 WL 1684743, at *17-18 (June 5, 2009) (Initial Decision).

The Bajic-Taneja Defendants violated Section 13(d) with respect to their beneficial

ownership of Blake stock.  Blake's shares were registered under Exchange Act Section 12(g).

*See* Donelan Decl., ¶29.  As of July 10, 2015, the Bajic-Taneja Defendants had acquired more

than five percent of Blake's outstanding shares. *See supra* p. 8 (chart).  Though the shares were

nominally owned by separate corporate entities, the Bajic-Taneja Defendants collectively acted

as a "person" under Section 13(d)(3)—which includes two or more persons acting as a group for

the purpose of acquiring, holding or disposing of securities—and they were beneficial owners

pursuant to Rule 13d-3 by virtue of their dispositional authority over the securities. *See* 15

U.S.C. §78m(d)(3); 17 C.F.R. §240.13d-3.  The Bajic-Taneja Defendants did not file a Schedule

13D with respect to their ownership of Blake stock. *See supra* p. 7-8.  Accordingly, the

Commission has established a likelihood of proving that the Bajic-Taneja Defendants violated

Section 13(d)(1) of the Exchange Act and Rule 13d-1 thereunder.

## IV.    The Court Should Freeze Assets Belonging to the Bajic-Taneja Defendants to Prevent Their Dissipation.

To obtain an asset freeze, the Commission must show either: (1) a likelihood of success

on the merits; or (2) that an inference can be drawn that defendant has violated the federal

securities laws. *Smith*, 653 F.3d at 128.  This is a lesser required showing than what is required

for preliminary injunction. *Id.; SEC v. Jafar*, 13-CV-4645, 2015 WL 3604228, *7 (S.D.N.Y.

June 8, 2015) (noting that when an asset freeze is requested, the standard is lower than that of a

preliminary injunction and the SEC must show *either* a likelihood of success, *or* that an inference

can be drawn); *SEC v. One or More Unknown Traders in Securities of Onyx Pharmaceuticals, Inc.*, 296 F.R.D. 241, 255 (2d Cir. 2013) ("Asset freeze orders are less burdensome on defendants than other types of injunctive relief; for that reason, the required showing of success on the merits (or a permissible inference) is lower.").

As discussed above, the Commission has shown it is likely to succeed on the merits in this matter and has presented evidence from which an inference can be drawn that the Bajic-Taneja Defendants violated multiple federal securities laws, and did so repeatedly.

An asset freeze is also appropriate in cases, such as this one, where there is a likelihood of remaining assets being dissipated.  *See SEC v. Dubovoy*, No. 15-cv-6076, 2015 WL 6122261, at *3 (D.N.J. Oct. 16, 2015).  The purpose of an asset freeze is "to preserve funds that a defendant may be ordered to pay if he is held liable," *Onyx Pharmaceuticals*, 296 F.R.D. at 254, and "to ensure that any funds that may become due can be collected."  *Smith*, 653 F.3d at 127 (internal quotation marks and citation omitted).

To date, the Commission has been able to identify approximately $42 million in trading proceeds received by Bajic and Taneja or entities they control, or by them and their co-defendants, as the result of the trading described in the Complaint.  *See* Donelan Decl. ¶9.

 Based on the trading proceeds that flowed to the Bajic-Taneja Defendants, the Commission believes it may seek monetary judgments in excess of $42 million.  The bank accounts held by the Bajic-Taneja Defendants and/or the entities they control (of which the Commission is aware) do not presently hold assets in excess of $42 million.  Donelan Decl. ¶7.d. As such, all accounts and other assets of the Bajic-Taneja Defendants, in whatever form they may exist, should be frozen, so "that any of the funds that may become due," such as disgorgement, civil penalty, and prejudgment interest, "can be collected."  *See* 15 U.S.C.

§78u(d)(5); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (holding that a freeze

order on a brokerage account in an amount equal to the potential disgorgement and civil

monetary penalty was appropriate relief); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082,

1105-06 (2d Cir. 1972); *SEC v. Credit Bancorp Ltd.*, No. 99-Civ-11395, 2010 WL 768944, *3

(S.D.N.Y. Mar. 8, 2010) ("The asset freeze in this case is necessary to avoid further depletion of

funds pending a final judgment."); s*ee also Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1347

(2d Cir. 1974); *First Jersey Sec.,* 101 F.3d at 1476.

## V.     The Court Should Enter an Order to Repatriate Assets From Foreign Jurisdictions.

Courts may impose an order repatriating funds transferred to foreign jurisdictions.  While

the trading described in the complaint primarily occurred in the United States markets, the

proceeds of those sales were transferred out of the United States to brokerage accounts in a

number of foreign countries.  Both Bajic and Taneja are citizens of foreign countries and reside

outside of the United States, and the Commission is aware that the Bajic-Taneja Defendants hold

or have held accounts at financial institutions in Hong Kong, Singapore, and Canada.  *See*

Donelan Dec., ¶7.c-d.  A list of the bank and brokerage accounts of which the Commission is

aware is contained in paragraph I.A of the Proposed Order filed herewith.  If they transfer their

assets out of these financial institutions, it will be very difficult for the Commission to track

those assets in a timely manner.  The Commission believes that amounts traceable to the fraud

already have been transferred overseas into both known and unknown accounts.  A repatriation

order will further protect any remaining funds from dissipation and put the funds in a frozen

account under this Court's control until it is able to adjudicate this case, and if appropriate, enter

an order returning those funds to harmed investors.

## **CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that the Court enter an order freezing and repatriating the assets of the Bajic-Taneja Defendants in the form attached hereto.

Respectfully submitted,

/s/ Alicia Reed
Alicia Reed (NY Bar No. 4913596)
Kathleen Burdette Shields (Mass Bar No. 637438)
Rebecca Israel (NY Bar No. 4783304)
Eric A. Forni (Mass Bar No. 669685)
Amy Gwiazda (Mass Bar No.663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct);
(617) 573-4582 (Israel direct)
Fax: (617) 573-4590 (fax)
shieldska@sec.gov; israelr@sec.gov

DATED: January 6, 2020

### **Certificate of Service**

I hereby certify that, on January 6, 2020, a true and correct copy of the foregoing document and the supporting declaration of Trevor Donelan and its exhibits were filed through the Court's CM/ECF system, and accordingly, the document will be sent electronically to all participants registered to receive electronic notice in this case. In addition, the Commission has served a copy of the foregoing document on the following individuals and entities, who are not represented or registered to receive electronic notices in this case, at the following addresses and by the following means:

**Defendants:**
Steve Bajic
    By email to counsel who may represent Bajic in this matter but that representation has not been confirmed

Rajesh Taneja
    By email address used in connection with his brokerage and bank accounts

25

Norfolk Heights Ltd., Fountain Drive Ltd., Island Fortune Global Ltd., Crystalmount Ltd., Wisdom Chain Ltd., SSID Ltd., Sure Mighty, Ltd., Tamarind Investments Inc.
   By email addresses used in connection with their brokerage and bank accounts

Kenneth Ciapala.
   The Commission is currently exploring methods to serve Mr. Ciapala, who is presently in custody in the United Kingdom

Anthony Killarney and Blacklight SA
   The Commission is planning to serve Mr. Killarney via the Hague Convention in Switzerland

Christopher McKnight
   By email to counsel who has represented Mr. McKnight in other matters but whose representation in this matter is uncertain

Aaron Dale Wise
   By email to counsel who represented Mr. Wise during the investigation that led to the filing of this action, but whose representation in this matter is uncertain

                     /s/ Kathleen Burdette Shields
                     Kathleen Burdette Shields