USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  02/01/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

United States Securities and Exchange    :
Commission,                              :
                                         :
              Plaintiff,                 :
                                         :
                                         :
              -against-                  :
                                         :
Tamarind Investments, Inc., et al.,      :
                                         :
              Defendants.                :
-------------------------------------------------------------X

20-CV-0007 (LGS) (KHP)

**REPORT & RECOMMENDATION**
**FOLLOWING DAMAGES INQUEST**

**TO:     THE HONORABLE LORNA G. SCHOFIELD, United States District Judge**
**FROM:  KATHARINE H. PARKER, United Stated Magistrate Judge**

Plaintiff United States Securities and Exchange Commission (the "SEC") filed this civil

enforcement action against, among others, Defendants Steve Bajic and Rajesh Taneja (the

"Individual Defendants") and corporate entities Defendants Tamarind Investments, Inc.

("Tamarind"), Blacklight SA ("Blacklight"), and SSID Ltd. ("SSID") for violations of numerous

provisions of the federal securities laws stemming from a securities fraud scheme.  (*See* Compl.,

ECF No. 4.)  The SEC alleges that Defendants' fraudulent scheme violated Sections 5 and 17 of

the Securities Act of 1933 ("Securities Act"), codified at 15 U.S.C. §§ 77e, 77q, and Sections 10,

13 and 15 of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. §§ 78j,

78m, 78o.  At different points in time, each of these three foreign corporate entities failed to

appear or timely respond to the pleadings, prompting the SEC to move for default judgments,

all of which the Hon. Lorna G. Schofield granted.  (*See* ECF Nos. 164, 207.)  Judge Schofield

entered default judgment against Tamarind on September 3, 2020, after which she referred the case for a damages inquest.  Following the entry of default judgments against SSID and Blacklight on November 5, 2020, Judge Schofield amended the referral to include a damages inquest as to SSID and Blacklight as well. The Court, having already determined the corporate Defendants' liability, now must determine whether, and if so, the amounts these Defendants should be forced to disgorge, pay in prejudgment interest, and be civilly penalized.  For the reasons set forth below, I recommend setting the damages amounts consistent with the SEC's requested amounts to be disgorged and paid in prejudgment interest for all three Defendants, and recommend the imposition of certain civil penalties, as discussed below.

## FACTUAL BACKGROUND[1]

From on or around July 2015 through June 2019, in violation of federal securities laws, the Individual Defendants and the entities they controlled coordinated with the other Defendants to sell certain securities on behalf of undisclosed individuals ("control groups") who, in turn, controlled those securities' companies.  (Compl. ¶¶ 4, 53, 66.)  To shield the identity of the individuals within the control groups, the Individual Defendants used "nominee corporations," including Defendants Tamarind and SSID, to execute the transactions (the Individual Defendants and their nominee corporations are collectively referred to herein as the

---

[1] Because Judge Schofield has already held the Defendants to be in default at ECF Nos. 164 and 207, the SEC's well-pleaded factual allegations, with the exception of those related to damages, are accepted as true and all reasonable inferences are drawn in the SEC's favor.  *See Finkel v. Romanowicz,* 577 F.3d 79, 84 (2d Cir. 2009) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

"Platform Defendants").  (*See, e.g.*, Compl. ¶¶ 32, 42-44.)  The Complaint alleges that the three

Defendants at issue here helped garner tens of millions of dollars in trading proceeds through

the various schemes outlined in the Complaint, some of which involved the Platform

Defendants working in conjunction with Blacklight while others have the Platform Defendants

working without Blacklight.  (Compl. ¶ 4.)

The Complaint outlines in detail how one of the schemes worked; the Blake scheme is

one way in which the Individual Defendants and Blacklight effectuated illegal sales of

unregistered stocks to unwitting buyers using nominee corporations such as Tamarind and

SSID.  (Compl. ¶¶ 35-56.)  The Blake scheme resulted in the acquisition of virtually all of Blake's

outstanding stocks by a group of one or more unnamed individuals termed "Control Group A"

in the Complaint and the subsequent illegal sale of restricted securities (*i.e.*, dumping).  (*Id.*)

This was done in several steps.  First, in December 2013, Blacklight acquired stock directly from

Blake while also purchasing more stock from 35 unaffiliated investors and had them transfer

those shares to an offshore entity controlled by Blacklight.  (Compl. ¶¶ 36-37.)  Second, shortly

thereafter, another group of Blake investors, termed the "Original Blake Affiliates" in the

Complaint, sold their Blake stock and, at Control Group A's direction, transferred those shares

to seven different offshore nominee corporations, one of which was Tamarind and all of which

were controlled by either Blacklight or Control Group A.  (Compl. ¶¶ 37, 48.)  Once the stock

transfers were complete, Control Group A then had Blake issue additional restricted stock with

the effect of bringing each of the nominee corporation's holdings of Blake, as well as the

Blacklight entity, under the 5 percent reporting threshold.  (Compl. ¶¶ 38, 41.)

Now in control of Blake, Control Group A then began to engage in fraudulent and deceptive practices to increase the price and demand for Blake stock.  (Compl. ¶¶ 57-65.)  For example, Control Group A directed the Individual Defendants to transfer funds to a stock promotor, with the help of other individual defendants, in order to increase the volume of trading of Blake stock.  (Compl. ¶¶ 57-71.)  In doing so, Control Group A and the Individual Defendants, with the aid of other individual defendants, deliberately hid the fact that the promotion was being funded by the Control Group A, who were themselves the sellers.  The trading of Blake stock that ensued during this two-month promotion campaign was roughly twenty-six times greater than the daily average in the month preceding the promotion.  (Compl. ¶ 61.)  The Defendants engaged in similar stock promotions with respect to at least three additional securities other than Blake.  (Compl. ¶ 59.)  After the promotion ended around April 2017, and Blake stock price began to drop, the Platform Defendants began to execute trades with each other to artificially prop up the volume of sales, and therefore the price of Blake Stock.  (Compl. ¶ 69.)  The Platform Defendants are alleged to have generated $7.2 million in proceeds through their sale of Blake stock and received certain commission from those sales.  (Compl. ¶ 71.)

In a scheme similar to the Blake scheme, in working with other control groups of different publicly held companies, the Individual Defendants used their offshore nominee corporations to execute similar transactions on behalf of those control groups.  (Compl. ¶¶ 72-75.)  One of the nominee corporations used here was SSID, a Hong Kong corporation owned entirely by Taneja that transferred shared for Pacificorp Holdings Ltd.  (Compl. ¶¶ 18, 73.)

## PROCEDURAL HISTORY

The SEC filed its initial Complaint against Defendants on January 2, 2020.  Shortly

thereafter, on January 6, 2020, the SEC sought a preliminary injunction freezing the assets of

the Platform Defendants.  Mr. Taneja is the sole shareholder of Tamarind and SSID (Compl. ¶¶

21, ECF No. 4; ECF No. 6-7); the Individual Defendants did not have any ownership or control

over Blacklight.  (Compl. ¶ 24.)  The Court granted the SEC's injunction on January 9, 2020, later

revising the order on January 15, 2020.  (ECF Nos. 37, 45.)

Given that all the corporate Defendants in this case are foreign entities, the SEC was not

able to quickly effect service on all Defendants.  On January 4, 2020, Tamarind was personally

served at Hannah Waver House, The Valley, Anguilla, through the Hague Service Convention,

with its answer or response to the pleading due June 25, 2020.  (ECF No. 133.)  On July 17,

2020, Blacklight was served via mail, with its answer or response due August 7, 2020.  (ECF No.

150.)  On August 12, 2020, SSID was served via email, per agreement with Mr. Taneja, with its

answer or response due September 2, 2020.  (ECF No. 151.)  After failing to answer or

otherwise respond to the Complaint by the respective deadlines, the Clerk of Court issued

certificates of default as to each of these defendants:  Tamarind's certificate was issued on July

17, 2020 (ECF No. 136); SSID's on September 4, 2020 (ECF No. 163); and Blacklight's on

September 18, 2020 (ECF No. 176).  With respect to Tamarind, the Court granted the SEC's

application for default judgment on September 4, 2020, the same day the certificate was

issued.  (ECF No. 164.)  However, for Blacklight and SSID, the SEC did not seek a default

judgment against these defendants until October 1, 2020.  (*See* ECF No. 184-187.)  The Court

5

then ordered Blacklight and SSID to appear at a conference to show cause as to why default judgment should not be entered.  (ECF Nos. 188, 203.)  Both parties failed to appear, leading the Court to grant the SEC's applications for default judgments as to Blacklight and SSID.  (ECF No. 207.)

Thereafter, Judge Schofield amended the referral order to include SSID and Blacklight in the damages inquest already referred to me following the entry of default judgment for Tamarind.  (ECF No. 209.)  The Court held a damages inquest hearing for all three Defendants on January 7, 2021, at which Tamarind, Blacklight, and SSID all failed to appear (although a representative for Defendant Bajic did make an appearance).

**DISCUSSION**

When a party is held in default, a Court is required to accept as true all of a plaintiff's well-pleaded allegations as to liability; however, the same is not true for allegations regarding damages.  *See Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012); *Terry v. Masterpiece Advert. Design*, No. 17-cv-8240 (NRB), 2018 WL 3104091, at *1-2 (S.D.N.Y. June 21, 2018).  However, during a damages inquest, a plaintiff's damages calculations or allegations regarding damages must be shown to have an evidentiary basis— while a Court may require a hearing, a Court is also entitled to deem the evidence presented through papers sufficient to make this determination.  *See* Fed. R. Civ. P. 55(b)(2); *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

I. **The Facts Pleaded Establish the Alleged Securities Violations**

Before turning to an assessment of the appropriate damages, although this Court has already determined that all three Defendants have liability for the alleged securities violations (see ECF Nos. 164, 207), out of an abundance of caution, the Court will review the SEC's well-pleaded allegations establishing the five federal securities laws violations alleged.

Section 5 of the Securities Act prohibits, among other things, selling and offering to sell securities without registration statements for those securities.  15 U.S.C. § 77e(a), (c).  A plaintiff states a prima facia violation of Section 5 by showing:  "(1) lack of a registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *SEC v. Caledonian Bank Ltd*., 145 F. Supp. 3d 290, 305 (S.D.N.Y. 2015) (quoting *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006)).  Notably, no showing of scienter is required to prove a violation of this section of the securities laws.  *See SEC v. Boock*, No. 09-cv- 8261 (DLC), 2011 WL 3792819, at *15 (S.D.N.Y. Aug. 25, 2011) (citing *Aaron v. SEC*, 446 U.S. 680, 714 n.5 (1980)).  All three defendants are alleged to have "engaged in steps necessary to the distribution of [unregistered] security issues" and were "necessary participant[s]" and "substantial factor[s]" in the unregistered sales or offers of sales of unregistered securities.  *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941); *Zacharias v. SEC*, 569 F.3d 458, 464-66 (D.C. Cir. 2009) (applying "substantial factor" test).  For example, Blacklight and Tamarind are both alleged to have been part of the Blake scheme.  That scheme involved the sale of restricted securities of a control group as ordinary unrestricted securities to unwitting buyers, routed through foreign nominee corporations (i.e. utilizing interstate communications), made pursuant

to registration statements that deprived the buyer's of the fact that the stocks being sold were restricted and held by the control group. (Compl. ¶¶ 35-56, 67.) The failure to properly register these sales of restricted securities therefore satisfied all three elements of a Section 5 violation with respect to Blacklight and Tamarind's involvement in the Blake scheme. As for SSID, the Individual Defendants used SSID, at minimum, in their scheme unaffiliated with Blacklight, that operated in much the same way. SSID was used to illegally hold stock for other control groups of public companies, pursuant to which they sold restricted securities without properly filing registration statements that would have identified the restricted nature of the securities. (Compl. ¶¶ 72-75.) As SSID and the other entities in this scheme were also offshore (see Compl. ¶ 73), the three prima facie elements of a Section 5 violation are satisfied here for SSID for the same reasons as discussed for the Blake scheme.

Sections 10(b) of the Exchange Act and 17(a) of the Securities Act both prevent the use of fraudulent and deceptive practices in conjunction with the offer or sale of securities. *See* 15 U.S.C. §§ 77q(b), 78j(a). Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase or sale of a security, are violated if a person "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Pentagon Capital Management PLC*, 725 F.3d 279, 285 (2d Cir. 2013) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)). A false statement was made with the requisite scienter if it was made with the "intent to deceive, manipulate, or defraud." *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012) (internal quotation marks omitted). "[S]cienter may

be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* (internal quotation marks omitted). The analysis for the violations of these two different sections of the securities laws can be done together because the elements of both claims, including violations of Rule 10b-5, are "[e]ssentially the same." *SEC v. Frohling*, 664 F. App'x 66, 69 (2d Cir. 2016) (citing *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999)).

The SEC outlines four different categories of conduct that are alleged to be deceptive and fraudulent practices taken in connection with these three Defendants sale of stocks. First, the use of offshore nominee corporations to conceal the related nature of the Individual Defendants, their client control groups, and the nominees themselves. (*See* Compl. ¶¶ 35-56.) Second, coordinating the transfer of stock and subsequent sales using the Blake nominee corporations that were intentionally kept below the 5 percent threshold to avoid disclosure. (*See* Compl. ¶¶ 38, 41.) Third, suspicious and coordinated activity designed to inflate the price of Blake stock prompting unwitting buyers to purchase the stock. (*See* Compl. ¶¶ 66-71.) And fourth, sending funds from the nominee corporations to a stock promotor who, in turn, induced buyers to purchase stocks controlled by Defendants pursuant to their illegal scheme. (See Compl. ¶¶ 57-65.) These allegations easily satisfy the third element requiring the actual sale or purchase of securities. As to whether these practices were fraudulent and done with the requisite intent, the deceptive nature and obfuscating conduct of the Defendants in engaging in these four categories of conduct is also clear. The Blake scheme is a good example that

encapsulates most of the above categories.  The three defendants were involved in a scheme whereby a single control group worked with Blacklight and the Individual Defendants to distribute less-than-5% blocks of their own restricted shares, then engaged in deceptive and fraudulent practices to manipulate the price of Blake stock in order to sell those restricted shares for significant profits on the open market to buyers believing they were purchasing unrestricted shares in the ordinary course.  It is fair to say that this is highly unreasonably conduct representing a significant departure from honest and fair dealing with securities.  *See e.g.*, *SEC v. First Jersey Sec.*, Inc., 101 F.3d 1450, 1471 (2d Cir. 1996) (affirming district court's judgment that defendant violated Sections 17(a), 10(b), and Rule 10b-5 where defendant intentionally sold marked up securities to its customers and "was able to do so in part because of its nondisclosures to customers as to the nature of the market and the Firm's control of the market").  Thus, the SEC has made well-pleaded allegations satisfying the prima facie elements for violations of Sections 10 of the Exchange Act and 17 of the Securities Act.

Section 13(d)(1) of the Exchange Act requires any individual or entity acquiring more than a 5 percent equity holding of a company registered under Section 12(g) of the Exchange Act to disclose their holding and identity.  15 U.S.C. § 78m(d)(1); *see also* 17 C.F.R. §240.13d-101 (Rule 13d-1).  To comply with this requirement, an individual or entity acquiring such a share must file a Schedule 13D with the Commission within ten business days after the. Id. Scienter is not required to establish a violation of Section 13(d).  *See In the Matter of Lexington Res., Inc., et al.*, SEC Release No. 379, 2009 WL 1684743, at *17-18 (June 5, 2009) (Initial Decision).  In the course of the Blake scheme, Blacklight and the Individual Defendants,

particularly through the use of Tamarind as relevant here, effectively acquired or controlled more than 5 percent of the outstanding shares of Blake, an entity registered under Exchange Act Section 12(g), through their deceptive scheme with Control Group A without disclosing its holdings.  (Compl. ¶¶ 36-38, 48, 52 54-55.)  Similarly, in the non-Blacklight affiliated scheme, the Individual Defendants used other nominee corporations, such as SSID, to engage in a similar scheme involving the acquisition of more than 5 percent of the outstanding shares of Pacificorps Holdings Ltd., which is also an entity registered under Exchange Act Section 12(g). (Compl. ¶ 73.)  While under both schemes the separate nominee corporations technically held less than 5 percent of the respective Section 12(g)-registered entitles, in both instances, through the fraudulent combination with other entities, the nominee corporations, and thus, the three Defendants here, can be viewed as acting collectively as a "person" under Section 13(d)(3).  *See* 15 U.S.C. §78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection."); *see also* 17 C.F.R. §240.13d-3 (defining "beneficial owner" for purposes of Section 13(d)).  Thus, the well-pleaded allegations in the Complaint satisfy the prima facie case for violation of Section 13(d) of the Exchange Act.

Finally, Section 15 of the Exchange Act requires those engaging in securities transactions on behalf of others to register as broker-dealers.  15 U.S.C. § 78o(a)(1).  Factors courts look to in determining whether a person is acting as a broker include:

> (1) is an employee of the issuer of the securities; (2) receives transaction-based commission as opposed to a salary; (3) sells, or previously sold, the securities of other issuers; (4) participates in negotiations between the issuer and the investor; (5) makes valuations regarding the merits of the investment or gives advice; and (6) finds investors actively rather than passively.

*Found. Ventures, LLC v. F2G, Ltd.*, No. 08-cv-10066 (PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (collecting cases); *see SEC v. Hansen*, No. 83-cv-3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)). There is no scienter requirement in establishing a prima facie violation of Section 15(a). *See SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003). All three defendants are alleged to have acted as unregistered brokers. Not much more need be added to the above discussion. All three entities sold securities on behalf of control groups, with Tamarind and Blacklight, as part of the Blake scheme, also actively soliciting buyers. And as will be discussed in more detail below, the control groups rewarded these three Defendants with significant commissions tied to each specific transaction. (*See, e.g.*, Compl. ¶¶ 10, 48, 53, 71, 73, 74.) Thus, the SEC has also sufficiently pleaded facts showing that the Defendants violated Section 15(a) of the Exchange Act.

In summary, the Complaint contains well-pleaded allegations that the three Defendants at issue in this damages inquest violated all five of the securities law provisions the SEC raises in its Complaint. Having summarized the already-established liability for each of these provisions, the Court now turns to its central task, which is an assessment of the appropriate amount of damages each for which each of the three Defendants should be held responsible.

## II. <u>Disgorgement</u>

The SEC seeks to disgorge Tamarind, SSID, and Blacklight of their ill-gotten gains from the illegal and fraudulent scheme. Under Section 78u(d)(5) of the Exchange Act, the SEC is entitled to seek, and a federal court has the power to grant, "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. 78(u)(d)(5). Recently, the Supreme Court clarified that a disgorgement award is available against the violators of the federal securities laws when first, the amount to be disgorged does not "exceed a wrongdoer's net profits," and second, the disgorged amount is to be distributed to the victims of the securities violations. *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1940 (2020). Courts have broad discretion in both determining if disgorgement is appropriate and, if so, calculating the award. *See SEC v. First Jersey Sec.*, Inc., 101 F.3d 1450, 1475 (2d Cir. 1996) (citing *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)). Regarding the precision of a disgorgement award, the amount calculated "need only be a reasonable approximation of profits causally connected to the violation," because "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).

The Court now turns to a review of the evidence provided by the SEC to ensure that there is a sufficient evidentiary basis for the amounts the SEC requests to be disgorged pursuant to Section 78u(d)(5) of the Exchange Act.

### A. Damages Against Tamarind

Because well-plead allegations regarding damages cannot be assumed as true without an evidentiary basis, the SEC submitted materials to evidence the amount of proceeds attributable to Tamarind. In those materials, the SEC alleges that the Blake scheme garnered

the Platform Defendants roughly $35 million in proceeds and that the Platform Defendants gained an additional $7.7 million in profit in other schemes unaffiliated with Blacklight. (Compl. ¶ 4.) In Exhibit 4 to the Declaration of Kathleen Shields ("Tamarind Decl."), dated July 28, 2020, the SEC provides a chart showing the amount specific amount the SEC believes Tamarind received in ill-gotten gains that should be disgorged. (Tamarind Decl. ECF No. 142-4 (Tamarind disgorgement chart).) This chart shows 273 transactions Tamarind coordinated, mostly with Blacklight, taking place between March 17, 2017 and June 3, 2019. It also shows Tamarind's brokerage accounts dealing with some 20 different securities, for a total commission amount of $3,738, 851.80.[2] (*Id.*; *see also* Tamarind Decl. ¶ 10.)

### B. Damages Against Blacklight and SSID

The SEC addressed Blacklight and SSID together in a second set of materials it submitted to provide an evidentiary basis for the damages amounts requested for these two Defendants. For SSID, the SEC created a chart akin to Tamarind's, showing a compilation of 170 transactions in SSID's accounts that again involve both Blacklight-coordinated and non-Blacklight-coordinated transactions. (Ex. 6 to the Declaration of Kathleen Shields ("SSID & Blacklight Decl.") ¶ 12, dated July 28, 2020, SSID & Blacklight Decl., ECF No. 187-6 (SSID disgorgement chart).) The chart shows SSID handling sales and purchases of 6 different securities between January 8, 2016 and May 28, 2019 resulting in $1,642,410.80 in commission or proceeds. (*Id.*)

---

[2] There are entries dated September 27 and 28, 2017, but both transactions were purchases, not sales, and resulted in losses in both instances. Thus, these are not included in the date range.

Given Blacklight's differing position from SSID and Tamarind in this case, the SEC had to create multiple different charts showing its disgorgement calculations for Blacklight.  The first chart is in the same format as the prior two charts discussed for Tamarind and SSID, with the one difference being that the first column of the Blacklight chart shows the name of the Nominee Corporation to which Blacklight directed a transaction or the transaction it executed itself.  (Ex. 7 to SSID & Blacklight Decl.), dated Oct. 1, 200, ECF No. 187-7.)  Another major difference is the sheer volume of the transactions, as the Blacklight chart spans 94 pages, while the other two charts are no longer than 9 pages.  This Blacklight chart shows that Blacklight directed 44 different Nominee Corporations to engage in tractions with roughly 180 different securities, between January 2016 and December 2018, resulting in $44,070,003.52 in proceeds to Blacklight's Nominee Corporations.  (*Id.*)  Because Blacklight did not receive these proceeds directly, but rather, via a commission its Nominees paid to it, the SEC then applied the low end of Blacklight's 6-10% commission rate (Compl. ¶ 10.), which produces a figure of $2,764,200.21 in commission from the fraudulent transactions in Exhibit 7.  (*See* Ex. 8 to SSID & Blacklight Decl.)  However, the chart at Exhibit 7 does not account for the commissions that the Individual Defendants paid to Blacklight as a result of trades executed by their controlled Nominee Corporations (as opposed to Blacklight-controlled Nominees).  Exhibit 8 shows that amount for each year in 2016, 2017, and 2018, indicating a total of $1,551,818.91 that the Individual Defendants paid to Blacklight in commission, for a total disgorgement amount of $4,316,019.14.  (*Id.*)

*       *       *

The Court has reviewed the SEC's submissions and is convinced that the SEC has provided an appropriate evidentiary basis for determining the proper amount each of the three Defendants garnered in ill-gotten gains. The Tamarind and SSID disgorgement charts, which show each of the transactions the respective nominee was involved in, regardless of which scheme it was a part of, and lists the commission that each transaction netted in trading proceeds. As for Blacklight, the same is true, except a conservative and consistent 6 percent commission was applied to their proceeds, as Blacklight was more akin to the Individual Defendants than a nominee corporation, thus requiring a slightly different approach. Further, the SEC need only prove the amount to be disgorged with reasonable proximity. *See SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (the amount calculated "need only be a reasonable approximation of profits causally connected to the violation"). The SEC has accomplished that here. As such, I recommend awarding the full disgorgement amounts the SEC requests for each Defendant, all of which do not exceed the amount of ill-gotten gains (as the amounts requested are equal to the ill-gotten gains), and which the SEC has represented it will distribute to some investors (but not all given the logistics associated with identifying all investors and their loss amounts). Specifically, I recommend Tamarind be ordered to disgorge $3,738,851.80, SSID be ordered to disgorge $1,642,410.80, and Blacklight be ordered to disgorge $4,316,019.12 in ill-gotten gains stemming from Defendants' securities violations.

## III. Prejudgment Interest

The SEC also seeks prejudgment interest against all three Defendants. While a civil litigant is entitled to seek prejudgment interest for the entire time between the onset of the

wrongful conduct and a final judgment, given the freeze the SEC successfully secured at the onset of this case in January 2020, the SEC only seeks to recover prejudgment interest through December 31, 2019 (this is true even for Blacklight, who's assets were never frozen).  The theory behind awards of prejudgment interest is to prevent a wrongdoer from receiving the benefits of what effectively is an interest-free loan.  *See SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  Again, the Court exercises its equitable discretion in determining if, and how much, prejudgment interest should be awarded.  *See Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1071-72 (2d Cir. 1995).  Here, the SEC proposes to use the "IRS Underpayment Rate," compounded quarterly, as its method of calculating prejudgment interest for all three Defendants.  (*See* Tamarind Decl. Ex. 5; SSID & Blacklight Decl. Exs. 9-10.) This is the typical method used by the SEC when it seeks disgorgement as the result of a successful enforcement action.  *See* 17 C.F.R. §201.600(b) (SEC regulations on how to calculate prejudgment interest); *see also First Jersey Sec.*, 101 F.3d at 1476.  This rate is a reflection of what the federal government would charge an individual to borrow money.  *Id.*  Given the longstanding use of this method, as well as its consistent approval by courts of this Circuit, I recommend finding the SEC's proposed method of calculating prejudgment interest to be appropriate.

In calculating the prejudgment interest, the SEC calculated the annual interested by year, and assumed that all trading proceeds were received on the last day of the year in which they were earned (which benefits Defendants).  (Statement of Damages ¶ 17, ECF No. 227.) Given the SEC's deliberate and conservative calculations, and the SEC's decision not to seek

prejudgment interest for the time period in which assets were frozen (and would not have accrued any interest from which the Defendants could benefit), I recommend finding that the requested prejudgment interest for all three Defendants be awarded in the amount requested. Specifically, I recommend finding Tamarind responsible for $2,663,012.73, SSID responsible for $$729,680.48, and Blacklight responsible for $456,466.31 in prejudgment interest.

### IV. Civil Penalties

Finally, the SEC seeks an unspecified amount in civil penalties against Defendants.  Civil penalties are authorized against parties in violation of federal securities laws under both the Securities Act and Exchange Act.  *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).  Under these identical schemes, the statutes provide for a three-tiered penalty system, with the highest tier requiring a two-step showing:  first, there must be fraud, deceit, manipulation, or deliberate or reckless disregard of the law, and second, that conduct must "result in substantial losses or create a significant risk of substantial losses to the other persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  While the penalty scheme provides a maximum amount for each of the three tiers, the scheme does not provide a particular formula or method of determining an appropriate penalty.  Rather, as is true for the previously discussed penalties, the Court must exercise its equitable discretion in fashioning a penalty.  *See SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).  Courts in this Circuit are guided by a set of factors that assess both the propriety and degree of a civil penalty:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the

risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Lybrand*, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005); *see also SEC v. Verdiramo*, No. 10-cv-1888 (RMB) (AJP), 2013 WL 57823, at *3 (S.D.N.Y. Jan. 7, 2013), *report and recommendation adopted*, 2013 WL 399230 (S.D.N.Y. Feb. 1, 2013); *SEC v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 27 (2d Cir. 2010).

Again, because the well-pleaded factual allegations, particularly those regarding liability, in the Complaint are to be construed as admitted by the defaulting defendants, this Court is well within its discretion to impose tier-three penalties because the two factors are met: the SEC made well-plead allegations that the Defendants' intended to defraud their investors and, as discussed above, did so in violation of the law and in a manner that not only foresaw the risk of substantial loss to investors, but as evidenced by the millions of dollars in net proceeds discussed above for each Defendant, did in fact result in substantial loss. Therefore, the Court will now turn to an application of the factors to the three Defendants, in consideration of whether a third-tier civil penalty is appropriate.

Factors one, two, three and five all weigh in favor of awarding a civil penalty on all three Defendants. The SEC's well-pleaded factual allegations regarding the extent of the scheme, its repetitive nature, and the risk of substantial loss (or actual loss) it, as discussed above, sufficiently show the egregiousness of each of the three Defendants' conduct. Each

Defendants' participation in the illegal scheme spanned years, involved hundreds of transactions, often dozens of securities, dozens of investors, and garnered Defendants' millions in ill-gotten gains. *See supra* § I. Disgorgement. Similarly, the SEC alleged that the Defendants all entered into this scheme knowingly and intentionally as evidenced, for example, by the representations Mr. Taneja made when filling out forms to open new brokerage accounts for Tamarind that misrepresented it as an investment holding vehicle with no other beneficial owners. (Compl. ¶¶ 53-54; *see also* ECF No. 6-6 at 1-2, 5.) Another example showing the deliberate intent to deceive was the coordinated efforts to break up the various control groups the Defendants' benefitted into less than 5% ownership blocks to make the scheme's transaction appear ordinary. (Compl. ¶¶ 152-55.)

Regarding the fourth and sixth factors—admission of wrongdoing and cooperation, respectively—while Tamarind and SSID are similarly situated, Blacklight is not. Tamarind and SSID both acted as Nominee Corporations for the Individual Defendants—who controlled a handful of such corporations beyond just Tamarind and SSID—but which were solely owned by Mr. Taneja. The SEC represented to this Court that Mr. Taneja has been working with the SEC by assisting their collection of the assets of the various corporate entity Defendants he controlled or owned. The SEC emphasized that this assistance is far from trivial given the obstacles the U.S. often faces in enforcing federal court judgments that impose awards such as disgorgement, prejudgment interest, and, particularly troublesome, civil penalties. This factor weighs heavily against a civil penalty for these two Defendants. However, despite the assistance Mr. Taneja has provided on behalf of Tamarind and SSID, both corporate entities

failed to appear in this case, and defaulted, which necessarily means that both entities have not owned up to their wrongdoing. The same is true for Blacklight with respect to its failure to appear. Blacklight, however, is not owned or controlled by Mr. Taneja, and no controller of Blacklight has similarly cooperated with the Government in recovering asserts or otherwise. Thus, the fourth and sixth factors both weigh in favor of imposing a civil penalty on Blacklight.

The Defendants' ability to pay a civil penalty is the final factor. Regarding SSID and Tamarind, the SEC represented to the Court that these entities are unlikely to have sufficient funds in their accounts (which are currently frozen) to pay any civil penalty in addition to the disgorgement and prejudgment interest amounts they requested, and which I recommend be awarded. Thus, taking the representation as true, these defendants do not have the ability to pay a civil penalty. Because a civil penalty pursuant to an SEC enforcement action cannot be imposed jointly and severally, if the corporate entities cannot pay the amounts, then the SEC is unlikely to ever be able to recover any civil penalty. *See SEC v. Pentagon Capital Mgmt., PLC*, 725 F.3d 279, 287-88 (2d Cir. 2013) (holding enforcement action civil penalties cannot be imposed jointly and severally because to do so would violate the statutory language focused on the individual entity at fault). This factor then weighs against the imposition of a penalty. The opposite is true for Blacklight. Given Blacklight's non-cooperation with the SEC, failure to appear, and the SEC's difficulty in locating their assets—which is why the SEC never sought to freeze Blacklight's assets—there is nothing on the record indicating Blacklight has an inability to pay. Therefore, this factor is neutral or weighs in favor of the imposition of a civil penalty.

To summarize, for Tamarind and SSID, there are significant factors weighing both in favor and against a civil penalty.  While their conduct was egregious, long-standing, and resulted in significant losses to investors, the sole shareholder of both entities has been cooperative with the Government in a materially meaningful way and the corporate entities are likely unable to pay a penalty anyway.  Another aspect to consider is the fact that, while imposing liability on the Individual Defendants, the District Judge in this case, while forcing them to disgorge ill-gotten gains and pay prejudgment interest, did not impose civil penalties upon them.  In consideration of all the above, I recommend finding that a civil penalty is not appropriate for Tamarind and SSID.  Notably, although the SEC argued for civil penalties in their papers, during the inquest hearing, the SEC's counsel indicated that it may be appropriate not to impose any penalty on Tamarind and SSID.  As for Blacklight, every single factor weighs in favor of a civil penalty.  Likewise, at the inquest hearing, counsel for the SEC reiterated the SEC's desire for a civil penalty as to Blacklight.  Given the above, and the SEC's recently restated position, I recommend finding that a civil penalty is appropriate for Blacklight.

Now that a recommendation for a civil penalty has been made, the Court must determine the appropriate amount.  Tier-three civil penalties allows for the Court to impose a maximum award of the greater of either a dollar amount per "violation" or the gross pecuniary gain resulting from the violation.  *See* 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  The SEC only made argument with respect to the former method, and it is not clear if the net trading proceeds discussed in the disgorgement section are equivalent to the gross pecuniary gain.  Given the SEC's focus on the former method, and the fact that the Court uses its equitable

discretion when determining a civil penalty anyway, the Court will focus solely on the by-violation method. Courts within this Circuit use at least two methods of determining what a "violation" is—counting either each instance of a misrepresentation (or the like) or each statutory provision that was violated. *Cf. SEC v. Tourre*, 4 F. Supp. 3d 579, 594 (S.D.N.Y. 2014) (using the by-representation method), *with Colonial Inv. Mgmt.*, 659 F. Supp. at 467 (using the by-the-statutory-provision method). As discussed at the inquest hearing, given the foreign nature of the corporate Defendants, calculating the penalty by the representation is less feasible or practicable than by the statutory provision violated, which is five provisions for each Defendant. However, given the obstacles faced by the SEC in attempting to recover civil penalties, the SEC suggested at oral argument that an imposition of a single violation penalty may be appropriate. Per the tier-three language and the SEC's regulations, the civil penalty for a single violation made by a non-natural person (i.e. a corporate entity) is $963,837. 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(ii); 17 C.F.R. § 201.100(b). Given the significant amounts I recommend ordering Blacklight to disgorge and pay in prejudgment interest, the difficulties the SEC has in recovering civil penalties in foreign jurisdictions, and the SEC's statement at the inquest hearing that a single violation penalty would be appropriate and acceptable, I recommend a one-violation tier-three civil penalty of $963,837.

## CONCLUSION

In light of the foregoing, following this Court's inquest on damages following the entry of default judgment, I recommend imposing damage amounts on the Defendants as follows: for Tamarind, $3,738,851.80 in disgorgement, $2,663,012.73 in prejudgment interest, with no

imposition of a civil penalty, for a total of $6,401,864.53; for SSID, $1,642,410.80 in

disgorgement, $729,680.48 in prejudgment interest, with no imposition of a civil penalty, for a

total of $2,372,091.28; and for Blacklight, $4,316,019.12 in disgorgement, $456,466.31 in

prejudgment interest, with a civil penalty of $963,837, for a total of $5,736,322.43.

Dated: February 1, 2021
    New York, New York                         Respectfully Submitted,

_____
KATHARINE H. PARKER
United States Magistrate Judge

<u>**NOTICE**</u>

**Plaintiff shall have fourteen days, and Defendants shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).**

**Plaintiff shall have fourteen days to serve and file any response. Defendants shall have fourteen days to serve and file any response. Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield at the United States Courthouse, 40 Foley Square, New York, New York 10007, and served on the other parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Schofield. The failure to file timely objections shall result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).**