```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
SECURITIES AND EXCHANGE                                       :
COMMISSION,                                                   :
                                                              :         20 Civ. 7 (LGS)
                                           Plaintiff,         :
                                                              :       OPINION AND ORDER
              -against-                                       :
                                                              :
STEVE M. BAJIC, et al.,                                       :
                                                              :
                                           Defendants.        :
------------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

The Securities and Exchange Commission ("SEC") brought this securities fraud action against Defendant Christopher Lee McKnight and fourteen other Defendants. On November 23, 2020, the SEC and McKnight settled with respect to injunctive relief and stipulated that any claim for monetary relief would be determined by the Court on a motion by the SEC (the "Partial Judgment"). The SEC now moves for disgorgement, prejudgment interest and civil penalty from McKnight. For the reasons below, the SEC's motion is granted in part.

I.   BACKGROUND

The following facts are taken from the Complaint.[1] Pursuant to the Partial Judgment, they are "accepted as and deemed true" for purposes of this motion.

A.   Platform Defendants

From July 2015 to June 2019, Defendants Steve Bajic, Rajesh Taneja, Kenneth Ciapala and Anthony Killarney, along with the various corporate Defendants (the "Platform Defendants"),

---

[1] References are to the original complaint dated January 2, 2020, at Dkt. No. 4. The parties' submissions cite the original complaint as, at the time the Partial Judgment issued, an amended complaint had not been filed properly on the docket. In any event, the original complaint is substantially the same as the amended complaint as to allegations against McKnight.

engaged in fraudulent coordinated activity to sell unregistered shares of multiple companies. The Platform Defendants acted as intermediaries to provide a layer of disguise through which control persons -- i.e., public company affiliates -- could conceal their identities while selling large amounts of stock to investors in the open market. The Platform Defendants' sales of the stock of publicly traded companies were treated by the market as if they were sales by ordinary investors when, in actuality, the Platform Defendants were dumping stock on behalf of corporate insiders. The stock could not be legally sold in the manner and in the quantities that the Platform Defendants sold it. The Platform Defendants concealed the identities of control persons and knowingly or recklessly schemed to evade the SEC's registration and disclosure requirements. The Platform Defendants' coordinated dumping involved selling securities of at least forty-five public companies.

The Platform Defendants also manipulated the stock price and volume of various companies to create the false appearance of active trading for the purpose of inducing investors to buy and sell stock. The Platform Defendants coordinated their trading activity with the intent to manipulate the supply and demand of the stock they intended to sell.

### B. McKnight's Involvement

Defendants Bajic and Taneja paid stock promoters to tout the securities at issue. McKnight and Defendant Aaron Dale Wise acted as intermediaries for these payments to disguise their source, offering two layers of corporate structures between the promoters and Platform Defendants. McKnight and Wise knew, or were reckless in not knowing, that stock promoters typically identify the paying party in public stock promotional alerts and that investors would find it important to know if the person paying for the stock promotion is also involved in selling that stock.

Between December 2016 and June 2017, McKnight and Wise helped disguise the stock promotion payments relating to at least four securities. During this period, Bajic and/or Taneja transferred in total $4,050,000 to a Singapore-based entity controlled by McKnight and created false

invoices to create the appearance that the transfers were for legitimate services. McKnight hired Wise to create an online presence for McKnight's entity to make it appear legitimate. McKnight transferred $3,682,480 of the money he received from Bajic and/or Taneja to an entity controlled by Wise, keeping $367,520 for himself. Wise, at McKnight's direction, then transferred $3,373,500 to a company that hires stock promoters (the "Promotion Arranger"). As payment, Wise kept $308,980 for himself.

McKnight was the sole point of contact to coordinate with the Promotion Arranger about the budget for, and timing of, each of the stock promotional campaigns. McKnight also chose the creative content providers for those promotions. The Promotion Arranger routinely asked McKnight to provide the name of the third party paying for each promotion because that information was typically disclosed in the promotional materials. McKnight gave the Promotion Arranger false names of the paying entities. Both McKnight and Wise knew, or were reckless in not knowing, that they were substantially assisting the efforts of the Platform Defendants and control groups to sell stock illegally in connection with the promotional campaigns.

### C.  Procedural History

The Complaint alleges that McKnight violated section 17(a)(3) of the Securities Act of 1933 (the "Securities Act") and aided and abetted violations by the Platform Defendants and various control groups of sections 5(a), 5(c), 17(a)(1) and (3) of the Securities Act, and section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10(b)-5(a) and (c) thereunder.

On November 23, 2020, the Court entered the Partial Judgment which, *inter alia*, ordered McKnight to pay disgorgement and, if ordered by the Court, a civil penalty. The Partial Judgment states:

> IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant shall pay disgorgement of ill-gotten gains and prejudgment interest thereon; that the amounts of the disgorgement and any civil penalty shall be determined by the Court upon motion of the Commission; and that prejudgment

interest shall be calculated based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. §6621(a)(2).

The Partial Judgment provides that, in connection with the SEC's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion, McKnight would be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint, that he could not challenge the validity of the Partial Judgment or the consent that was made part of the Partial Judgment, that the allegations of the Complaint would be accepted as and deemed true by the Court solely for the purposes of the motion and that the Court could determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.

## II.     DISCUSSION

The SEC seeks entry of final judgment against McKnight that incorporates the terms of the Partial Judgment, requires disgorgement of $985,044 plus prejudgment interest of $164,082, and imposes a civil penalty of $100,000.  For the reasons below, the motion is granted in part.

### A.     Disgorgement

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996); *accord SEC v. Penn*, No. 21-1348-CV, 2022 WL 2517218, at *2 (2d Cir. July 7, 2022) (summary order).  The Exchange Act provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement."  15 U.S.C. § 78u(d)(7).  "Equity practice long authorized courts to strip wrongdoers of their ill-gotten gains." *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020).  Under the Supreme Court's decision in *Liu*,

4

"disgorgement awards issued as 'equitable relief' [are limited] to a 'wrongdoer's net profits.'" *SEC v. de Maison*, No. 18-2564-CV, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) (summary order) (quoting *Liu*, 140 S. Ct. at 1940). However, "'[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation,' and 'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Id.* (quoting *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013)); *see SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (disgorgement needs only be a reasonable approximation); *SEC v. Kapur*, No. 11 Civ. 8094, 2012 WL 5964389, at *2 (S.D.N.Y. Nov. 29, 2012).

"'Once the SEC has met the burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant' . . . who is 'obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation.'" *de Maison*, 2021 WL 5936385, at *2 (quoting *Razmilovic*, 738 F.3d at 31-32); *accord SEC v. Genovese*, 553 F. Supp. 3d 24, 47 (S.D.N.Y. 2021); *SEC v. Cope*, No. 14 Civ. 7575, 2021 WL 653088, at *2 (S.D.N.Y. Feb. 19, 2021). "[S]pecific tracing [is] unnecessary in ordering disgorgement for securities fraud." *de Maison*, 2021 WL 5936385, at *2 (quoting *SEC v. Contorinis*, 743 F.3d 296, 303 n.3 (2d Cir. 2014)).

Here, the SEC seeks disgorgement of McKnight's profits from coordinating stock promotions and for serving as a payment intermediary for those promotions in 2016 and 2017. Based on bank records from iBiz Media Systems -- a company controlled by McKnight -- and other information the SEC received during its investigation, the SEC approximates that McKnight received funds totaling $1,260,678 for his involvement. The amount includes payments to McKnight's company from (1) Silverton SA/WB21, an illegal trading platform and money distribution service used by control groups (here, "Control Group A") and others to engage in fraudulent trading of microcap securities, (2) Reformation Services, the entity controlled by co-

defendant Wise that Wise used to receive money from Bajic, Taneja and their control group clients to transmit money to stock promoters and (3) affiliates of Control Group A. McKnight also made payments to Wise's company, totaling $275,375. Netting these payments against each other and reducing the total by the $259 incurred in transaction fees[2] yields a net profit of $985,044, i.e., the amount the SEC seeks to disgorge. The Court agrees that this amount represents a "reasonable approximation of profits causally connected to the violation," and that McKnight bears "any risk of uncertainty." *de Maison*, 2021 WL 5936385, at *2.

McKnight's arguments to the contrary are unpersuasive. First, he suggests that the SEC fails to satisfy its initial burden of establishing a proper disgorgement amount since the SEC "does not identify the name of the company that McKnight allegedly controlled which received these funds," identify the "bank statements and information" it reviewed or "provide any copies of the bank statements to support their disgorgement demand." The argument is moot as the SEC has since named McKnight's company in, and attached bank records and other such documentation to, the Supplemental Donelan Declaration.

Second, McKnight identifies inconsistencies between the transactions identified by the SEC and the bank statements in his possession, including incorrect dates and amounts of some transactions. Specifically, McKnight questions the inclusion of a $50,352 payment on September 14, 2016, from Silverton SA/WB21 and a $50,000 payment on September 30, 2016, from a company owned by a member of Control Group A. In response, the SEC corrected the date of the $50,532 payment to September 14, 2018, and substantiated the $50,000 payment with an account statement and wire transfer detail report. The remaining inconsistencies are accounted for in the

---

[2] Initially the SEC sought $985,303 in disgorgement plus corresponding prejudgment interest. In light of "slight discrepancies in the amounts received or sent by [McKnight] as the result of bank fees, wire fees and/or fees from [the] Silverton SA" trading platform, the SEC reduced its requested disgorgement amount by $259 (and corresponding prejudgment interest).

SEC's revised disgorgement request (i.e., a $259 reduction) or adequately explained in the Supplemental Donelan Declaration.

Finally, McKnight argues that he should be permitted to deduct from the disgorgement amount $157,915 of software development expenses that iBiz Media incurred, citing *Liu*, 140 S. Ct. at 1950 ("[C]ourts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)" to "ensure that any disgorgement award falls within the limits of equity practice while preventing defendants from profiting from their own wrong."). McKnight reads *Liu* too broadly. The deductions contemplated in *Liu* are only those "incurred in producing the revenues that are subject to disgorgement." *Liu*, 140 S. Ct. at 1950; *see SEC v. Govil*, No. 21 Civ. 6150, 2022 WL 1639467, at *3 (S.D.N.Y. May 24, 2022) (Where investors did not benefit from defendant's surrender of stock, deducting stock value from SEC's disgorgement request "runs counter to the purposes of disgorgement."). Here, there is no connection between McKnight's receipt of ill-gotten gains and his choice to invest some of those gains in his software development business. McKnight's business did not generate his ill-gotten gain, nor did it benefit the investors who were harmed by McKnight's conduct. The notion that a defendant is entitled to deduct all "legitimate expenses," whether related to the fraudulent scheme or not, is unfounded. Disgorgement in the amount of $985,044 is appropriate.

B.   **Prejudgment Interest**

The SEC seeks prejudgment interest on the disgorgement amount. Since the "primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws . . . it is within the discretion of a court to award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits." *Razmilovic*, 738 F.3d at 36 (internal quotation marks omitted). "Requiring payment of interest prevents a defendant from obtaining the

benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007) (internal quotation marks omitted). An award of prejudgment interest on a defendant's disgorgement obligation at the IRS underpayment rate is appropriate because it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [his illegal conduct]." *SEC v. Ahmed*, 72 F.4th 379, 404 (2d Cir. 2023) (internal quotation marks omitted).

The SEC's application for prejudgment interest is adequately supported. The SEC calculates prejudgment interest on McKnight's net proceeds for each calendar year separately, assuming that each year's net proceeds were received on the last day of the year in which he received it and applying the interest rate used by the Internal Revenue Service for underpayments set forth in 26 U.S.C. § 6621(a)(2), which changes quarterly. McKnight does not challenge the SEC's request for, or calculation of, prejudgment interest. Prejudgment interest in the amount of $164,082, as calculated in the Supplemental Donelan Declaration, is awarded.

  **C.** **Civil Penalty**

The SEC also seeks a civil penalty from McKnight. The Securities Act and Exchange Act authorize the SEC to seek the imposition of civil money penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Civil penalties serve "the dual goals of punishment of the individual violator and deterrence of future violations." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (internal quotation marks omitted); *accord SEC v. Engler*, No. 20 Civ. 1625, 2022 WL 4596745, at *11 (E.D.N.Y. Sept. 30, 2022). Courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first, second or third penalty tier. 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B). A

first-tier penalty may be imposed for any violation of the Exchange Act or the Securities Act. 15 U.S.C. § 77t(d)(2)(A); 15 U.S.C. § 78u(d)(3)(B)(i). A second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); 15 U.S.C. § 78u(d)(3)(B)(ii). And a third-tier penalty may be imposed when, in addition to meeting the requirements of a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii); *see SEC v. Madsen*, No. 17 Civ. 8300, 2018 WL 5023945, at *3 (S.D.N.Y. Oct. 17, 2018); *Kapur*, 2012 WL 5964389, at *6.

Although the statutory tier establishes the maximum penalty, "the actual amount of the penalty [is] left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *accord SEC v. Mattessich*, No. 18 Civ. 5884, 2022 WL 16948236, at *11 (S.D.N.Y. Nov. 15, 2022). "In assessing the appropriate civil monetary penalty, courts have considered the following factors: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation." *Genovese*, 553 F. Supp. 3d at 46 (internal quotation marks omitted); *see SEC v. Rajaratnam*, 918 F.3d 36, 44-45 (2d Cir. 2019) (approving consideration of some of these factors and stating that the list is not exhaustive). Finally, because the statutory penalty provisions authorize civil penalties "for each violation," 15 U.S.C. § 78u(d)(3)(B)(i), but do not define the term "violation," courts exercise discretion in calculating the number of "violations," and thus the number of penalties to be imposed in a given case. *See SEC v. Vali Mgmt. Partners*, No. 21-453-CV, 2022 WL 2155094, at *3 (2d Cir. June 15, 2022) (summary order), *cert. denied sub nom. Pustelnik v. SEC*, 143 S. Ct. 788 (2023); *In re Reserve Fund Secs. & Derivative Litig.*, No. 9 Md. 2011, No. 9 Civ. 4346, 2013 WL 5432334, at

*20 (S.D.N.Y. Sept. 30, 2013) (describing varying methodologies courts have used to calculate the number of "violations").

In light of the foregoing factors, a third-tier penalty is appropriate. McKnight's violations facilitated a fraud that directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to investors who bought the securities sold into the market by the Platform Defendants and their control group clients. His misconduct lasted several months and targeted at least four securities. *See, e.g.*, *SEC v. Lybrand*, 281 F. Supp. 2d 726, 731 (S.D.N.Y. 2003), *aff'd sub nom. SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) (imposing third-tier penalty where "the actions of [the defendants] involved a multitude of improper securities transactions that occurred over several months -- they violated the securities laws repeatedly and with regularity"). McKnight also acted knowingly, or with a deliberate disregard for the truth, in concealing the identity of the party paying for the stock promotions, acting as a middleman between groups that controlled stock and the promotion arrangers and providing false information that would be used in promotions. *See, e.g.*, *SEC v. O'Brien*, No. 21 Civ. 9575, 2023 WL 3645205, at *14 (S.D.N.Y. May 25, 2023) (imposing third-tier penalty where facts showing scienter were "palpable").

The civil-penalty statute authorizes the SEC to seek a third-tier penalty of the gross pecuniary gain to a defendant as a result of a violation, here $985,044, or a specific amount per violation, here $207,183 per violation. *See* Dkt. No. 272 at 5-6; *SEC v. Xia*, No. 21 Civ. 5350, 2022 WL 17539124, at *30 n.43 (E.D.N.Y. Dec. 8, 2022); *see also* 15 U.S.C. §77t(d)(2); 15 U.S.C. §78u(d)(3)(B); 17 C.F.R. § 201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of Jan. 15, 2022), https://www.sec.gov/files/civil-penalties-inflation-adjustments_1.pdf [https://perma.cc/2KAU-UB8R]. The SEC's request for a $100,000 penalty is modest in comparison.

McKnight argues that a civil penalty should not be imposed at all because (1) other remedies are sufficient to deter future misconduct and (2) he "lacks the financial means to pay a substantial disgorgement award, much less a civil penalty." A civil penalty is necessary, in addition to disgorgement, for general deterrence. Congress provided for civil penalties because "[d]isgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud." *Off. Comm. of Unsecured Creditors of WorldCom, Inc.*, 467 F.3d at 81. Here, where McKnight has not been charged criminally, some economic penalty is warranted. *Cf. SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395, 2002 WL 31422602, at *4 (S.D.N.Y. Oct. 29, 2002). However, McKnight's personal financial circumstances suggest that a more limited penalty would have a sufficient deterrent effect. On August 31, 2023, McKnight filed under seal a sworn financial statement including, *inter alia*, current assets and liabilities, credit cards, monthly cash flow and monthly expenses/disbursements. Taking this information into account -- i.e., McKnight's relatively low net worth, substantial debt and negative cash flow -- while also recognizing the nature of McKnight's conduct and the importance of general deterrence, the Court imposes a civil penalty of $75,000. The Court imposed the same civil penalty on Defendant Wise, who was less culpable than McKnight but had better financial circumstances.

### III. CONCLUSION

For the foregoing reasons, the SEC's motion for monetary remedies against McKnight is **GRANTED IN PART**. The Court imposes disgorgement of $985,044 plus prejudgment interest of $164,082, and a civil penalty of $75,000. An amended form of final judgment as to McKnight will issue separately.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 264.

Dated: September 27, 2023
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE